NACIONAL FINANCIERA, S. A., Plaintiff, *v.* JAMES SPEYER and Others, Individually and as Copartners Doing Business under the Firm Name and Style of SPEYER & Co., Defendants, and RALPH KOPPELMAN, Individually and as Representative of All Holders of United States of Mexico 4% Gold Bonds of 1904 Similarly Situated, Defendant.

First Department, April 10, 1941.

*Jerome S. Hess* of counsel [*Frank Rashap* with him on the brief; *Hardin, Hess & Eder*, attorneys], for the plaintiff.

*Ralph Wolf* of counsel [*Cadwalader, Wickersham & Taft* and *Hays, Wolf, Schwabacher & Sklar*, attorneys], for the defendants James Speyer and others, individually and as copartners of Speyer & Co.

*George B. Tepper*, for the defendant Ralph Koppelman.

DORE, J. On this submission of controversy under sections 546 to 548 of the Civil Practice Act the question presented is whether a fund in the hands of defendants Speyer & Company should be paid to plaintiff, as assignee of the United States of Mexico (hereinafter called " Mexico "), or whether Speyer & Company should pay over the fund to bondholders of the Mexican Government's Four Per Cent Gold Bonds of 1904 (hereafter called the " bondholders ").

Plaintiff Nacional Financiera, S. A., is a foreign corporation organized under the laws of Mexico. Defendants are copartners engaged at the times mentioned herein in the business of private banking under the name of Speyer & Company (hereinafter called " Speyer "). Defendant Koppelman is the owner of $10,000 face value United States of Mexico Four Per Cent Gold Bonds of 1904, appearing individually and as representative of all holders of said bonds similarly situated.

On October 31, 1904, Speyer, representing a syndicate of bankers, made an agreement with the Federal executive in the Department of Finance of Mexico under which Speyer agreed to purchase from the Mexican government $40,000,000 of its Four Per Cent Gold Bonds of 1904. The loan which formed the subject of the agreement was payable within fifty years from December 1, 1904, by means of equal half-yearly payments of 2.325% of the loan sufficient to meet the accruing interest and extinguish the principal within such period, each semi-annual payment being $930,000 in gold coin of the United States of America, to be applied to amortization of the loan after payment of all interest due thereon. The funds to meet the semi-annual payments were to be placed in Speyer's

hands in New York not later than the fifteenth day of May and November in each year, and the loan was made a direct liability of Mexico. The necessary funds were to be delivered by the government to the National Bank of Mexico sufficiently in advance so that the bank, acting as agent of the government, could place the funds in Speyer's hands fifteen days before the maturity of each coupon. Speyer had charge of the remittance out of such funds to the members of the syndicate in London, Frankfort, Berlin and Paris, of the sums necessary for the service of the loan, and was required to render an account to Mexico of the funds received semi-annually. The general accounts connected with the loan were to be kept by Speyer in New York in gold coin of the United States of America, and all Mexico's correspondence in connection with the business was to be carried on by Speyer authorized exclusively to act in regard to all matters in connection with the carrying out of the contract and the service of the loan.

Speyer and its associates purchased the bonds from Mexico, sold them to the public, and Speyer in connection with the loan maintained the following two accounts:

(1) United States of Mexico Four Per Cent Bonds, Coupon and Redemption Account.

(2) United States of Mexico Four Per Cent Bonds, Sinking Fund Account.

Moneys remitted by Mexico to Speyer on account of the service of the bonds were first credited to the redemption account and payment of interest made therefrom. Interest on current balances was credited to the redemption account. Thereafter Speyer transferred from this account to the sinking fund account a sum sufficient to meet the amortization requirements and used the funds in the last mentioned account for such amortization. Prior to November 15, 1913, any sums remaining in the redemption account after payment of interest and amortization were from time to time repaid to Mexico by crediting the balance to a general account maintained by Mexico with Speyer.

From December, 1904, to December 1, 1913, Mexico paid Speyer the full amounts due sufficient to meet interest and amortization, and Speyer paid from their general funds the amounts due bondholders for coupon payments and amortization payments during such period, debiting the appropriate Mexican account.

Thereafter, and before May 15, 1914, Mexico paid Speyer only the sum of $289,230.80 instead of the sum of $930,000 due June 1, 1914, and the sum paid was credited to the redemption account. Since June 1, 1914, no other or further payments have been made by Mexico on account of the bonds; on that date the bonds went

into default and have ever since continued in default as to the payments then due and all subsequent payments; and Speyer has been holding and still holds the $289,230.80 for the benefit of such person or persons as the court may determine to be entitled thereto.

Before the institution of this action, defendant Koppelman, as plaintiff on his own behalf and on behalf of all holders of the bonds similarly situated, commenced an action in the Supreme Court of this State against some of the defendants then composing the firm of Speyer, as defendants, asking for an adjudication that the fund in question belonged to the bondholders. No other bondholders commenced an action; no one has sought to intervene; the bondholders are thousands in number and their identity is unknown.

On May 6, 1940, Mexico assigned to plaintiff Nacional Financiera, S. A., for good and valuable consideration all its right to any claim against Speyer arising out of the 1904 agreement or the said fund on deposit with Speyer. Plaintiff on October 22, 1940, as assignee, demanded payment and Speyer refused to pay. All the parties consent that on payment by Speyer of the fund to the person or persons to whom this court adjudges it belongs, Speyer shall be released and discharged from any liability. The submission, however, is entered into without prejudice to any claim that parties defendants may have for expenses and counsel fees, subject to the order of the court.

Plaintiff contends that Mexico's deposit of funds with Speyer created the relation of depositor and banker, that is, of debtor and creditor; that Speyer was Mexico's fiscal agent; and accordingly that plaintiff as Mexico's assignee is entitled to return of the deposit. Defendant bondholder contends that an equitable lien attached to the fund in favor of the bondholders when Speyer received the money from Mexico; that the fund was so received by Speyer as agent or trustee for the bondholders; that having purchased their bonds from Speyer, the bondholders stand in the same position as Speyer with respect to the fund; that Mexico has no claim to it, and having defaulted on its obligations, its assignee does not come before the court with clean hands; and defendant asks for judgment in favor of the bondholders. Speyer, as stakeholder, is neutral on the conflicting claims and is prepared to dispose of the fund as this court shall adjudicate.

Claims to money deposited in a bank for the payment of coupons have been disposed of by submissions of controversy on agreed statements of facts. (*Noyes* v. *First National Bank of New York*, 180 App. Div. 162; affd., 224 N. Y. 542; *Erb* v. *Banco di Napoli*, 243 id. 45.)

The propriety of a representative action similar to that which the defendant Koppelman instituted was sustained in *Guffanti* v. *National Surety Company* (196 N. Y. 452), where an action was brought on a surety bond for a defaulting principal who had embezzled the moneys deposited with him. There, as here, the total amount of claims exceeded the amount of the fund available through the bond, and the claims arose out of the same instrument; there were numerous claimants in various jurisdictions, some of whom in all likelihood had no knowledge of the default. The Court of Appeals said: " Surely this is a case where a suit in equity will aid to distribute, so far as possible, the limited fund represented by the penalty of the bond in accordance with the intention of the statute. The rules of equity are not so technical and cumbersome that they cannot lay hold of the situation described in the complaints for the relief of the courts and to do justice among the claimants. * * *.

" We have in the case under consideration not only a multiplicity of suits which may be brought against the same defendant, but they all grow out of the same contract, and there is a limited fund out of which the aggregate recoveries must be sought."

We think the facts presented in the agreed statement bring the case within the rule well settled in this jurisdiction and in the Federal courts that deposit of money in a bank by a corporate debtor, municipality or State with instructions to use it to pay maturing coupons of the depositor when and as duly presented, gives rise to the relationship of debtor and creditor, of principal and agent between the depositor and the bank, and does not create a trust in favor of the holders of outstanding coupons. (*Noyes* v. *First National Bank of New York*, 180 App. Div. 162, 166 [First Dept.]; affd., 224 N. Y. 542; *Staten Island Cricket & Baseball Club* v. *Farmers' Loan & Trust Co.*, 41 App. Div. 321 [Second Dept. 1899]; *Erb* v. *Banco di Napoli*, 243 N. Y. 45; *Manhattan Co.* v. *Blake*, 148 U. S. 412, 426; 2 Jones on Bonds and Bond Securities, [4th ed. 1935] § 805; 3 Scott on Trusts, [1939] § 531.1, pp. 2535–2540.) In *Erb* v. *Banco di Napoli* the plaintiff, as the owner of three interest-bearing coupon bonds of the Italian government, sued the bank which the Italian government had furnished with funds to pay on the presentation and surrender of the coupons. The bank refused to pay because the coupons had been lost, and the plaintiff sued on an agreed statement of facts on the theory that the bank was liable for money had and received. The Municipal Court gave judgment to the bondholder. The Appellate Term (121 Misc. 668) reversed, holding that the bank was merely the agent of the Italian government. This court (213 App. Div.

265) reversed the Appellate Term on the authority of *Lawrence v. Fox* (20 N. Y. 268) and gave judgment for the bondholder who had put up a surety bond of indemnity in case the coupons were found. The Court of Appeals reversed, holding that *Lawrence v. Fox* was not applicable as there the agreement was made upon consideration to pay money received to a third party, and the defendant was intrusted with the money upon an express promise to pay, and said: " The case of *Noyes* v. *First National Bank of New York* (180 App. Div. 162; affd., 224 N. Y. 542) seems to be directly in point. There it was held that money sent to a bank to pay interest coupons and entered by the bank in a special account for this purpose did not create a trust in favor of the holders of outstanding coupons. This was also the decision in *Staten Island Cricket & Baseball Club* v. *Farmers' Loan & Trust Co.* (41 App. Div. 321), where the same element was lacking as pointed out here. ' The defendant,' said the court, ' has entered into no agreement to pay the bondholders, nor has it made any promise that it would pay them.' "

In *Matter of Kountze Bros.* (27 F. Supp. 1002 [1938 D. C. S. D., N. Y.]), where funds were deposited with private bankers to pay interest on bonds of the city of Los Angeles, it was held that the mere fact that the funds were deposited for a special purpose is not inconsistent with ordinary debtor and creditor relationships, and on appeal (103 F. [2d] 785) it was held that it is clear under the law of New York that no trust is created for the benefit of coupon holders merely by reason of a deposit for the special purpose of paying interest on bonds.

In *Schloss* v. *Powell* (93 F. [2d] 518 [C. C. A. Fourth Circuit, Jan. 1938]), Seaboard Air Line Railway Company, before it went into the hands of receivers, had deposited funds with the City Bank Farmers Trust Company in New York to pay, when due, coupons on bonds issued by the railway company. A bondholder sued the receivers for the balances in the hands of the bank transferred to the account of the receivers. It appeared that no part of the balances had been withdrawn by the railway company, that no interest thereon was paid by the bank, and that the bank handled the fund in its trust department. Nevertheless, the District Court held that a trust for the bondholders was not created and directed the balance to be paid to the receivers of the railroad. The Circuit Court of Appeals, affirming, said: " But the deposit of money in a bank by a corporate debtor, with instructions to use it to pay maturing coupons as they are presented by bondholders, no more appearing, is not sufficient to show an irrevocable intention so to apply the fund and to impress it with a trust. On the contrary, such conduct gives rise to

the relationship of agency, and the depositor is at liberty to use the money for other purposes before it has been paid to the bondholders. *In re Interborough Consolidated Corporation*, D. C., 277 F. 249; Id., 2 Cir., 288 F. 334, 32 A. L. R. 932; *Guidise* v. *Island Refining Corporation*, D. C., 291 F. 922; *Staten Island Cricket & Baseball Club* v. *Farmers' Loan & Trust Co.*, 41 App. Div. 321, 58 N. Y. S. 460; *Noyes* v. *First Nat. Bank of New York*, 180 App. Div. 162, 167 N. Y. S. 288; affirmed 224 N. Y. 542, 120 N. E. 870."

*Rogers Locomotive, etc., Works* v. *Kelley* (88 N. Y. 234), relied on by the bondholders, was the case of an express trust. The brokers in that case received the funds deposited to pay interest on bonds, giving a receipt reciting that the money was received " in trust to apply the same to an equal amount of the coupons, * * * the said money not to be subject to the control of said company, otherwise than for the payment of said coupons." This express declaration clearly evidenced an intention to create a trust for coupon holders. In the case before us such facts are not presented. There is nothing to indicate the creation of a trust or the making of Speyer agent of the bondholders to receive payment irrevocably appropriated for their benefit by the obligor.

Mexico has defaulted on these bonds since 1914 and the bondholders urge that it is most inequitable to direct payment to the assignee of the defaulting obligor when the unpaid bondholders are seeking only a small part of what the obligor owed them and has failed to pay. But as appears from the submission, the controversy before us is whether plaintiff is entitled to a judgment *against Speyer*, adjudging plaintiff to be owner of the fund, or whether defendant, as representative of the bondholders, is entitled to a judgment determining that Speyer holds the money for the account of the bondholders and should pay it to them. The proceeding is in law and not in equity. We are called upon to determine the legal rights of the respective parties to the funds in Speyer's hands. Although this large sum has been held by Speyer for more than twenty-five years since default, there is nothing before us to show what efforts, if any, bondholders have made seasonably to assert their claims other than the institution of the suit above referred to by defendant Koppelman in which no other bondholder has intervened. If the bondholders have not completely lost their rights by lapse of time or laches as against Mexico, the original obligor, they are not deprived by the judgment to be entered herein of rights or remedies, if any, that they may have or retain against the original obligor or even against the fund in the hands of its assignee. We only hold on the stipulated facts that Speyer is not obliged to pay the bondholders but must pay plaintiff.

Assuming the court in the circumstances disclosed should be inclined so to construe the instrument as to find in favor of the unpaid bondholders, we find in the submission before us no circumstances sufficient to take the case out of the general rule which seems to be so well settled that its application here may not be avoided. Speyer made no promise to the bondholders to act for them. On the contrary, by the terms of the contract Speyer acted solely as the fiscal agent of Mexico on a debtor and creditor relationship with Mexico. Speyer was authorized by Mexico and required to act in all matters bearing on the service of the loan, to keep accounts in connection therewith, and render the Mexican Government semi-annually an account of the moneys received. Speyer received a commission on the amount of each of the semi-annual payments out of which it was required to satisfy the charges of the other bankers in connection with the service of the loan. Speyer had charge of remittance to the bankers abroad and was required to inform Mexico of the rates of exchange, and differences of exchange arising from the operations were either to be credited or charged to the Mexican Government. Speyer was obligated to credit the Mexican Government with interest at a rate one per cent below the average rate for call loans in New York and not less than the rate of one per cent per annum nor more than four per cent per annum on all amounts reserved for payment of coupons for twenty days after they became collectible until payment, and on other amounts remitted by the government in advance, from the date of receipt thereof by Speyer. Finally Speyer paid from *its own general funds* the amounts due the bondholders by way of coupon payments and amortization payments, debiting the appropriate account. Sums remaining after payment of interest and amortization were repaid Mexico by crediting the balance to a general account maintained by Mexico with Speyer. These operative and essential facts destroy the contention that the moneys were a trust fund for the bondholders or that Speyer was their agent and not the fiscal agent of Mexico.

It is urged that the assignee's failure to demand interest on this large sum from the date of default and the fact that Speyer has credited no interest to the fund since default, indicate the absence of a debtor and creditor relationship. We think there is no merit to this contention. Concededly Speyer was required to pay and did pay interest on current balances prior to November 15, 1913, in accordance with the contract before the obligor defaulted; but clearly, when Mexico defaulted and breached its contract with Speyer, thereby depriving Speyer of the agreed commissions on all subsequent semi-annual payments, Speyer was not obligated to continue to pay interest to such defaulting obligor.

The issues arising out of deposits to pay principal and interest on bonds are usually presented by reason of the insolvency of either the depositor or the depositary. While insolvency is not here presented we cannot lose sight of the fact that the rules of law applicable to such deposits frequently have been formulated with a view to the rights of the bondholders and the rights of creditors of the obligor where such insolvency has intervened. Under the terms of this contract the transmission of the funds was not intended to nor did it constitute payment by Mexico to the bondholders. If the funds were lost through the bankruptcy or other failure of the bankers, the bondholders should not thereby lose their rights against the obligor. (*Silver* v. *Park-Lex Holding Corporation*, 222 App. Div. 40, 44 [First Dept.]. See, also, 39 Mich. Law Rev. 59, 70, 81.)

It should be noted that in spite of the long lapse of time, no defense based upon Statutes of Limitations or laches has been raised by Speyer on this submission, and issues arising out of such defenses are accordingly not before us.

The sum of $289,230.80 paid to Speyer in 1914 was on account of the next semi-annual service of the bonds due June 1, 1914, and such service implied amortization of principal as well as payment of interest due. However, the sum paid was insufficient even to meet the current interest due, which on June 1, 1914, was $740,750. While we confine our decision to the stipulated facts, we think, if necessary to decide the point, that Speyer was not made agent or trustee of the bondholders to receive payment for them of either the principal or the interest. (See 2 Jones on Bonds and Bond Securities, [4th ed.] §§ 766, 805, 1043.)

Applying the rules of law to the facts presented, we hold that Speyer was agent for Mexico in making the payments, not trustee-agent for the bondholders in receiving the funds with which to make payment, and, accordingly, plaintiff is entitled to judgment in the sum of $289,230.80, without costs.

MARTIN, P. J., O'MALLEY, TOWNLEY and UNTERMYER, JJ., concur.

Judgment unanimously directed in favor of the plaintiff in the sum of $289,230.80, without costs. Settle order on notice.