**In re RAND MINING CO.**
No. 6253.

District Court, S. D. California, N. D.
May 10, 1947.

Siemon, Maas & Siemon, and Alfred Siemon, all of Bakersfield, Cal., for petitioners.

Harvey, Johnston, Baker & Palmer, and Oran W. Palmer, all of Bakersfield, Cal., for trustee.

YANKWICH, District Judge.

On November 15, 1945, the debtor-bankrupt, Rand Mining Company, a copartnership, composed of I. D. Budd, J. P. Champagne and H. C. Cleveland, filed its petition for arrangement under Chapter 11, of the Bankruptcy Act of 1938, 11 U.S. C.A. 701 et seq. It was adjudged a bankrupt on September 13, 1946, when a trustee was appointed.

On August 8, 1946, the debtor-bankrupt filed its petition for restoration to it of the sum of $4,724.06 from W. M. Atkinson and Walter L. Maas, Jr., petitioners herein, who filed an Answer claiming title to the fund.

A hearing was had before the Referee, at which the petitioners challenged the Referee's jurisdiction to hear the matter summarily. The objection being overruled, the Referee proceeded to hear the matter. At the conclusion of the hearing, the petitioners moved to dismiss the proceeding. The Referee took the entire matter under submission.

On December 9, 1946, he made a turnover order directing Atkinson and Maas to turn over and deliver to Mildred Uhler, Trustee of the Bankrupt, the sum of money mentioned.

This is a petition to review the Order.

While the Referee did not file formal findings, his turnover order is, in effect, such, except as to certain matters to be noted later. In it, he found the following facts to be true, which I adopt as findings.

Prior to November 15, 1945, and within the four months' period preceding, namely on July 26, 1945, certain property of the debtor was attached by the Constable of the Tenth Township, Kern County, California,

under a writ of attachment, issued by the Superior Court of the State of California, in and for the County of Kern, in Case No. 42218, wherein W. M. Atkinson was plaintiff and the debtor-bankrupt was one of the defendants. On July 31, 1945, the debtor-bankrupt deposited with the Clerk of the Superior Court the sum of Four Thousand Seven Hundred Twenty Four and 06/100 Dollars pursuant to a stipulation of W. M. Atkinson and the debtor that the attached property be released upon the sum being deposited with the Clerk. The stipulation, among other things, recited that the Clerk should deliver the money to the prevailing party after final judgment. The attached property was then released. On or about March 20, 1946, W. M. Atkinson, with full knowledge of the pendency of the bankruptcy proceedings, took judgment against the debtor for Four Thousand Nine Hundred Thirty One and 57/100 Dollars and Eighty Five and 75/100 Dollars costs. The Judgment became final on May 21, 1946, and W. M. Atkinson and his agent, Walter L. Maas, Jr., Attorney, *with knowledge of the bankruptcy proceedings,* on that day obtained from the Clerk of the Superior Court the sum of Four Thousand Seven Hundred Twenty Four and 06/100 Dollars, which had been deposited with the Clerk by the debtor.

The evidence introduced before the Referee shows that Beulah H. Whitelaw purchased an interest in the Rand Mining Company for which she gave a check payable to the "Rand Mining Company", on July 30, 1946, for $5,000. On the same day, other persons purchased an interest, that is, Jay Eaton paid $1,000, Margaret Wells, $500, Mrs. H. C. Cleveland, $1,500 and Robert R. Coblentz, $1,000.

An agreement was entered into by the Rand Mining Company with each of the new partners making them members of the partnership on a percentage basis, dependent on the amount of their contribution. Mrs. Whitelaw was given a five per cent interest. The Agreement with her recited:

"First: Said co-partners of the Rand Mining Company have and do hereby agree to take into the business as a partner the above-mentioned Beulah H. Whitelaw for the consideration of Five Thousand Dollars ($5000.00) payment of which is hereby acknowledged.

"Second: *That all rights in the equipment, land, leases, and such other property as may be owned by the Rand Mining Company, either before the date of this instrument or hereinafter acquired, will be shared in by said Beulah H. Whitelaw in the same ratio as the division of profit or losses will be made as enumerated in section four of this agreement."* (Emphasis added.)

The other purchasers paid cash. Mrs. Whitelaw's check was cashed by the bankrupt, Rand Mining Company, and the proceeds, excepting $4,724.06, were used with the cash put up by the other persons, to pay power bills and wages.

An assignment of an interest in the partnership was given to each of the purchasers. Cleveland, one of the partners, with the $4,724.06 obtained from the check of Beulah H. Whitelaw purchased a cashier's check payable to R. J. Veon, Clerk of the Superior Court in Kern County, which was deposited with the Clerk by the debtor-bankrupt pursuant to the stipulation.

The documentary evidence and the transcript of the testimony of the hearing before the Referee, which is before us, support fully the conclusions of the Referee. Before this Court, as before the Referee, the petitioners are in the anomalous position of claiming that the money was not the debtor's, but that it was deposited by Mrs. Beulah Whitelaw. But, although the transcript shows her to have been present at the hearing, she never contradicted the statement of Cleveland, the partner, that the check which she paid *was not (as claimed by the petitioners) to purchase his or another individual partner's interest in the partnership, but to become a general partner with them.* The contract with her, which the petitioners introduced, is to that effect. Consequently, as the petitioners cannot claim subrogation, the only right they can assert to the money deposited to release the attachment must come from the attachment itself and from the stipulation under which the deposit was made.

The stipulation *did not* confer any right to the money. It recited that the money

was deposited *in lieu of bond,* and was to be paid over to the winning party.

■ Whatever right the petitioners claim thus springs from the Attachment. Any attachment within the four months' period is invalid under the specific wording of Subdivision a(1) of Section 67 of the Bankruptcy Act of 1938, 11 U.S.C.A. § 107, sub. a(1).

If we treat the transaction as a deposit for security or indemnification under Subdivision a(2) of the same section, 11 U.S.C.A. § 107, sub. a(2), it is a lien obtained by legal proceedings and, as such, invalid.

■ The invalidity, in either case, of course, stems from insolvency within the four months' period from the filing of the petition. See Liberty National Bank, of Roanoke, Va., v. Bear, 1928, 276 U.S. 215, 48 S.Ct. 252, 72 L.Ed. 536; Dixon v. Koplar, 8 Cir., 1939, 102 F.2d 295, 297, 4 Remington on Bankruptcy, 1943, Sec. 1616. For it is the date of the filing of the petition which determines the invalidity of an advantage of this character obtained through legal or equitable proceedings. And this is true both under the old law and the new law. See, 4 Remington on Bankruptcy, 1943, Secs. 1606, 1613; Adolph Ramish, Inc., v. Laugharn, 9 Cir., 1938, 86 F.2d 686, 688; and see my opinion In re Club New Yorker, 1936, D.C.Cal., 14 Fed.Supp. 694. The petitioners, at the oral argument, stressed the point that they acquired some kind of equitable lien. The argument is repeated in the brief filed later. And it is there insisted that the deposit was a contract to pay a judgment and therefore was not a true indemnity. There are cases which hold that a contract to pay a judgment without having first to look to the judgment debtor is not an indemnity, but an original promise. Hawk v. Barton, 1900, 130 Cal. 654, 63 P. 64; Manufacturer's Finance Corporation v. Vye-Neill Co., 1 Cir., 1933, 62 F.2d 625; Bradley v. Duty, 1946, 73 Cal.App.2d 522, 166 P.2d 914. But, as will presently appear, that does not solve the problem here because the deposit *was not conditioned* upon the payment of a judgment, but was denominated as being in lieu of a bond to release an attachment and was to be turned over to the winning party. As a fact, the amount was less than the judgment obtained. The petitioners seem to think that if the sale to Mrs. Whitelaw is illegal, they acquired certain rights. Assuming that the sale of an interest in a mining partnership requires a permit from the California Commissioner of Corporations, the agreement was fully executed. And certainly no one could complain, least of all Atkinson, who was not a party to the transaction. If the contract was illegal, the only person who could lay a claim to the money was Mrs. Whitelaw. And she has made none. See, Pollak v. Staunton, 1930, 210 Cal. 656, 293 P. 26; Olds v. Simmons, 1932, 123 Cal.App. 275, 11 P.2d 36; Brooks v. Brooks, 1941, 48 Cal.App.2d 347, 119 P.2d 970. If any one acquired some kind of equitable lien to the money arising from invalidity of transaction, it is certainly not the petitioners. Both under the old statute and the new one, only certain liens created by state law which are absolute in their nature are exempt from the interdiction. Of this character are vendors' liens, attorneys' liens, landlords' distress liens, and the like. See, 4 Remington on Bankruptcy, 1943, Sec. 1610; In re Prudence, 2 Cir., 1938, 96 F.2d 157; In re San Juan Gold, 2 Cir., 1938, 96 F.2d 60; Commercial Credit Co. v. Davidson, 5 Cir., 1940, 112 F.2d 54; Moses v. Labofish, 1942, 76 U.S.App.D.C. 401, 132 F.2d 16; Reconstruction Finance Corp. v. Sun Lumber Co., 4 Cir., 1942, 126 F.2d 731.

An example of such lien, recognized by our own Circuit Court of Appeals for the Ninth Circuit under the California law, is the so-called "trust receipt" created under the Uniform Trust Receipts Act of California. In re Boswell, 9 Cir., 1939, 96 F.2d 239.

■ But here, the deposit of the money did nothing but release from attachment the property of the debtor. *It did not rise above the lien which it released, the attachment. It gave neither party to the litigation any unconditional right, as of the date of the stipulation or of the deposit of the money* (July 31, 1945). And it specifically recited: "Both and all of the parties agree that nothing herein contained shall change the rights of either of the parties to any and all remedies that either or both may have, or that either would *have had*

*had this Stipulation not been filed.* It being understood and agreed that said Stipulation *shall be in place and stead of an undertaking for redelivery of the attached property."* (Emphasis added.)

Until there was a judgment against the debtor-bankrupt, the *money was returnable to it.* And as of the date when it was deposited, *it was the money of the debtor-bankrupt.* Title passed to the bankruptcy court, as of the date of the filing of the petition. It descended later to the Trustee. And no contingent right conferred by the Stipulation to a "possible" judgment could destroy the rights of the bankruptcy court.

The petitioners seem to place much weight on the "manner" in which the defendants were designated in some of the pleadings in the Superior Court. In the writ of attachment, it was as follows: "H. C. Cleveland, I. D. Budd and John Doe Champagne, and H. C. Cleveland, I. D. Budd and John Doe Champagne, doing business as the Rand Mining Company, a co-partnership."

Referring to the case of Potts v. Whitson, 1942, 52 Cal.App.2d 199, 125 P.2d 947, they argue that, under the California law, such designation does not bring the partnership *as an entity* into the lawsuit. The difficulty with that case is that it involved the validity of a default judgment which the District Court of Appeals of California decided should have been set aside by the Superior Court.

Courts do not favor default judgments. When it is sought to enforce such judgment, under circumstances which a higher court thinks should not, in justice and in equity, prevail, they will resort to rules of the most technical character in order to set aside the default. And that is exactly what the District Court of Appeals of California did in the cited case.

But the case before us does not involve a question of pleading in a default case or the binding effect of a default judgment. As only the writ of attachment, the constable's return, the release and the stipulation, were in the record, I caused the whole judgment roll to be brought up.

An examination of this record shows clearly that, regardless of the setting up of names in the heading of the pleadings, *the action was against the partnership, as an entity also.* The Complaint, filed July 25, 1945, was for money alleged to be due for services rendered to the defendants Cleveland, Budd, and Champagne, as individuals and the same three persons, who the Complaint alleged, were and now are "doing business in the name of the Rand Mining Company". Recovery was sought on account of labor and materials furnished to the defendants at an agreed price. And in a second cause of action the same amount was sought, $4,524.06, for the same work, labor and services on a *quantum meruit.* In all the defensive pleadings, beginning with the notice of motion for change of place of trial, the defendants referred to themselves in their double capacity, both as individuals and as "doing business as the Rand Mining Company, a copartnership." The same attorneys appeared for them all.

The Answer and Counterclaim, filed August 25, 1945 gives the same double capacity, Cleveland, Budd and Champagne as individuals, and the same three "doing business as the Rand Mining Company". The Amended Complaint, filed December 3, 1945, listed the defendants in the same manner, both as individuals and as "doing business as the Rand Mining Company, a co-partnership". The claim arose from labor performed in conjunction with the rental of mining machinery used in carrying on the mining operations of the partnership.

On January 3, 1946, the partners stipulated that the Answer which had been filed on their behalf, both as individuals and the partnership, should stand as the Answer to plaintiff's first amended Complaint, and that "any new matter in it shall be deemed denied". The Findings, dated March 19, 1946, listed, in the heading, the name of both the individuals and the partnership. They recited that the three defendants "were and are doing business in the name of Rand Mining Company". Then, after reciting the indebtedness of the defendants to plaintiff, they ordered judgment in the sum of $4,931.57. And the Judgment contained the following statement: "Wherefore, it is Ordered, Adjudged and Decreed

That plaintiff, W. M. Atkinson do have and recover from the defendants *H. C. Cleveland, I. D. Budd and J. P. Champagne, and H. C. Cleveland, I. D. Budd and J. P. Champagne, doing business as the Rand Mining Company, a co-partnership,* the sum of $4931.47, together with plaintiff's costs and disbursements incurred in this action amounting to the sum of $85.-75." (Emphasis added.)

So that it is quite evident that, regardless of the meaning of Potts v. Whitson, supra, when applied to a default judgment, the pleadings in the case before us show clearly that the proceedings were against *both the individuals and the partnership,* and that *the judgment ran against them all.* Under the circumstances, to build up an argument based upon the notation contained on some of the headings on some of the pleadings, which do not control the body of the pleadings, is to retreat from reality. What we have here is a partnership brought into court both through its individual members and as *an entity* and sued for work done on the mining property it owned, with final judgment going against both the individuals and *the partnership entity.*

There is no contradiction of the statement of Cleveland, the partner, made before the Referee that the money used to buy the cashier's check, which was deposited with the Clerk of the Superior Court, came from the sale of an interest in the partnership to Mrs. Whitelaw. A similar interest was sold to others at about the same time,—as already appears. The Whitelaw check for $5,000 was not made out to the individual partners, but to "Rand Mining Company". It was endorsed "Rand Mining Company, H. C. Cleveland, J. P. Champagne." Cleveland and Champagne received it, not for individual purposes, but for "partnership purposes". California Civil Code, Sec. 2419(2a). They had no right to apply it to the liquidation of debts of their own without a breach of the fiduciary relationship which the partnership imposed on them and without liability to the other partners. California Civil Code, Sec. 2414, 2415, 2419(2a), 2420. And what is more, *they did not.* As the presumption of good faith attaches to all

the acts of a partnership, it cannot be presumed, absent a claim by the partners themselves, or by the person who paid the money, that the money was used to settle a liability *not of the partnership, but of the individual partners.* In the proceeding before him, the Referee had the right to go into the facts. He had the right to determine, even in the face of contrary appearances (which do not exist here)— that, in reality, the money deposited was partnership money used to secure a release of partnership property, and that the judgment creditor acquired no right by reason of anything happening subsequently because, *as of the date of the petition,* the method adopted in order to give to one creditor an advantage, was null and void. And that consequently the subsequent judgment could not give legal life to what the bankruptcy law declares to be of no validity. As already stated, the petitioners, *not having acquired any right of their own,* cannot be subrogated to any rights which Mrs. Whitelaw might assert. This for the obvious reason that she has not asserted any such rights in these proceedings. She stood mute while the claim was made to this money as the property of the partnership. And, very accommodatingly, she furnished to the Referee the original of her check for $5,000, dated July 30, 1945.

Even under the law as it stood before the Bankruptcy Act of 1938, a claim of the type asserted here would be no more than colorable, the trustee would be considered in actual or constructive possession, and the situation would warrant the summary proceeding which the Referee adopted, and of which the petitioners complain here. See, In re Graessler & Reichwald, 2 Cir., 1907, 154 F. 478, cited with approval in Taubel, etc., Co. v. Fox, 1924, 264 U.S. 426, note 25, 44 S.Ct. 396, 68 L.Ed. 770; Thompson v. Magnolia Co., 1940, 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876; Cline v. Kaplan, 1944, 323 U.S. 97, 98, 99, 65 S.Ct. 155, 89 L.Ed. 97; Honeyman v. Hughes, 9 Cir., 1946, 156 F.2d 27, 28, 29. But their complaint must go unheeded. For when we consider the Bankruptcy Act of 1938, we find that it contains the following clause: "The court shall have summary jurisdiction of any

proceeding by the trustee or debtor, as the case may be, to hear and determine the rights of any parties under this subdivision a". 11 U.S.C.A. § 107, sub. a(4).

This subdivision teaches that it was the aim of the Chandler Act to confer summary jurisdiction *in all cases* arising under Subdivision a of Section 67, regardless of whether some of the instances it covered would have required plenary actions under the old law as interpreted by our courts. See, In re Club New Yorker, 1936, D.C. Cal., 14 F.Supp. 694; and see comment, 4 Remington on Bankruptcy, Sec. 1671.

The commentators on the Act have uniformly so interpreted the meaning of this subdivision. Remington makes this comment: "Subdivision a (4) is new. It confers summary jurisdiction to determine the rights of all parties under the subdivision". (4 Remington on Bankruptcy, 1943, Sec. 1608; see also Sec. 1617.)

The report of the House Judiciary Committee, in discussing the change proposed by this clause said: "Clause (4) represents a decided change from the present law, which requires a preferential lien to be set aside by plenary proceeding. The change is in the interest of expedition. The power of the court extends not only to a proceeding to set aside the original preferential lien, but also to a proceeding to set aside a transfer of property, or lien created, *for the purpose of indemnity*." (4 Remington on Bankruptcy, 1943, p. 386.)

And the Supreme Court accords. In Fischer v. Pauline Oil Co., 1940, 309 U.S. 294, 295, 302, note 11, 60 S.Ct. 535, 539, 84 L.Ed. 764, the Court says: "The Chandler Act, § 67, sub. a, 52 Stat. 876, vests *summary jurisdiction* in the bankruptcy court to hear and determine, after notice to the parties in interest, all questions affecting the validity of the lien." (Emphasis added.)

 So I conclude that the Referee was right in proceeding summarily.

 The two matters just discussed were the only ones treated by counsel in their oral argument on the review. The Trustee having filed a memorandum of authorities on the day of the argument, peti-

tioners requested time to reply. In this reply, *for the first time, they asserted that insolvency at the time of the deposit of the money had not been shown.* By the very wording of Subdivision a(1) of Section 67 of the Bankruptcy Act, 11 U.S.C.A. § 107, sub. a(1), insolvency is an essential element of the invalidity of a lien. 4 Remington on Bankruptcy, 1943, Sec. 1616; Liberty National Bank of Roanoke, Va., v. Bear, 1924, 265 U.S. 365, 44 S.Ct. 499, 68 L.Ed. 1057; J. S. & J. F. String, Inc., v. Birkhahn, 3 Cir. 1929, 30 F.2d 492; Arkansas Oil & Mining Co. v. Murray Tool & Supply Co., 8 Cir., 1942, 127 F.2d 564; Trautwein v. Mandel, 8 Cir., 1942, 127 F.2d 567. Subsequent adjudication cannot be retrojected to the time of the acquisition of the lien or even to the date of the petition, in order to draw an inference of insolvency. And the insolvency contemplated by this section is that defined by Subdivision (19) of Section 1 of the Bankruptcy Act of 1938, 11 U.S.C.A. § 1(19). Under it "a person shall be deemed insolvent within the provisions of this Act whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not at a fair valuation be sufficient in amount to pay his debts." 11 U.S.C.A. § 1(19).

This being the undisputed law on the subject, the failure to even advert to this topic in the oral argument led me to assume in the preliminary study which I made of the problem, that insolvency was conceded. The belated assertion to the contra̅ called for a re-examination of the record. I then found that insolvency *was not* alleged in the petition for the restoration of the moneys, *was not* argued before the Referee, and he made *no finding* on it in his turnover Order. Neither did the petition for arrangement allege insolvency.

Counsel for the Trustee conceded the fact. As insolvency is essential, both under the old and the new law, the review before me could not be decided without an inquiry into the matter. So, rather than return the matter to the Referee, I directed that the Trustee and the petition-

ers present evidence on the subject in open court before me. General Order 47, 11 U.S.C.A. following section 53. The petitioners raised the same objection against the summary proceeding before me which they had presented to the proceedings before the Referee. After overruling the objection, I heard testimony on the subject in open court.

This testimony establishes insolvency beyond dispute. The balance sheet as of July 26, 1945, prepared by one of the partners, Cleveland, *who is a registered public accountant,* shows assets in the sum of $33,899.47, and liabilities in the sum of $41,452.09. Two of the partners, Cleveland and Champagne, testified that the partnership, as of that date, had no assets other than those indicated by the books, and that the individual partners were also insolvent. The venture was typical of mining ventures in California. The partnership was organized on April 30, 1945. Champagne and Cleveland each put in $5,000. Budd, the third partner, put in the mining property as his contribution. However, it developed that, *in reality,* he had no title to the property or the equipment. As a fact, the first check for $1,000 contributed by Cleveland was turned over as part payment on the *conditional sales contract* on the equipment. The venture was characteristic of the optimistic attitude of miners. For many years, it passed from one owner to another. And, so far as is known, no one had ever made any money out of operating it. Other than the physical assets, the mining partnership owned nothing except the gold "possibilities" of the property. These, like all mining possibilities, were based, *not on realities,* but on what one of the witnesses admitted to be "hunches". In the petition for arrangement, these possibilities were valued at $200,000. The valuation was based upon a contract entered into before the petition for arrangement was made, which called for royalties in that amount, after which the property was to be ac-quired by the purchaser for $25,000. Why the partnership, on the basis of that agreement, valued the property at $200,000 is hard to understand, unless we take into consideration the sanguine attitude of the Western miner.

The petitioners' contention that the property was worth that much is based chiefly upon that statement in the petition for arrangement and the statement of Atkinson that one of the partners told him that the property was well financed, which is denied by the partner, and, in itself, means nothing.

The upshot of the matter is this: The only testimony worthy of credence shows clearly and conclusively that the partnership was insolvent on July 26, 1945. As a fact, it was insolvent when it was created on April 30th of that year. It remained in that condition until the time of the filing of the petition. The petition merely delayed insolvency on the miners' "hope" that the agreement for the sale of the mining property might save it. The additional money put in by Mrs. Whitelaw and the others was an attempt to stave off the inevitable. The optionee of the property, before the expiration of the 90-day period, and *after having engineers assay it,* gave it up. So that the valuation of the physical properties in the petition grounded on the option proved illusory,—a typical miner's dream. Which brings us back to the balance sheet, which values the property on the basis of the moneys actually invested in it. And that shows clearly that insolvency, as defined by Subsection (19) of Section 1 of Bankruptcy Act of 1938, 11 U.S.C.A. § 1(19), existed as of July 26, 1945.

It follows that the petitioners acquired no rights by reason of the stipulation under which the deposit to release the attachment was made. The Turnover Order of the Referee, dated December 9, 1946, is, therefore, affirmed.

Findings, as indicated in the separate Order of this date, are ordered to be prepared by counsel for the Trustee.