In the Matter of TELE–TONE RADIO
CORP., Debtor,

Tele-Tone New York Corp.,
Subsidiary Debtor,

Tele-Tone National Corp.,
Subsidiary Debtor.

No. 47–52.

United States District Court
D. New Jersey.
July 12, 1955.

Raymond Del Tufo, Jr., U. S. Atty., Newark, N. J., by Jerome D. Schwitzer, Asst. U. S. Atty., Newark, N. J., William Hagen, Philadelphia, Pa., of counsel, for the United States.

Seligson, Morris & Neuburger, by Charles Seligson, New York City, for Walter E. Heller & Co.

Robert Carey, Jr., Newark, N. J., for Paul H. Hudson, reorganization trustee.

Bergman & Rothbard, Newark, N. J., by Sidney M. Bergman, Newark, N. J., for Merritt Lane, Jr., bankruptcy trustee.

Abraham H. Sles, Jersey City, N. J., trustee in bankruptcy for Eureka Television & Tube Corp.

HARTSHORNE, District Judge.

Tele-Tone Radio Corporation was originally before the United States District Court for the Southern District of New York, as the object of proceedings under Chapter XI of the Bankruptcy Act.[1] The debtor was left in possession and the business operated for some months. Thereafter, an involuntary petition against Tele-Tone, ultimately including its above subsidiaries, was filed in this Court under Chapter X of the Bankruptcy Act,[2] the above petition in New York being dismissed. In the Chapter X proceedings Paul H. Hudson was appointed Trustee. After some months, it was found impossible to effectuate a reorganization. The Chapter X proceeding was accordingly terminated, save for the accounting of its Trustee, and Tele-Tone was ordered to be liquidated in bankruptcy,[3] Merritt Lane, Jr., being made Bankruptcy Trustee.

Certain similar, if not identic, questions were raised, both in this Court, as bearing upon the accounting of the Chapter X Trustee, and in the Bankruptcy Court, as bearing upon the proper liquidation of the assets of the bankrupt there. This was the case, for instance, with regard to the question of whether the United States Government had a tax trust amounting to $85,409.16, which should accordingly be paid over directly to the United States, rather than turned over by the Chapter X Trustee to the

---

1. 11 U.S.C.A. § 701 et seq.

2. 11 U.S.C.A. § 501 et seq.

3. 11 U.S.C.A. § 1 et seq.

Bankruptcy Trustee, for administration in the Bankruptcy Court. Consequently, this Court referred that question, previously raised before the Referee in Bankruptcy, to the Referee, as Special Master. to report thereon to this Court. The Referee and Special Master reported thereon in his report, now on exceptions before this Court.

The second question, so reported on, was as to whether the Chapter X Trustee, still in possession of much of the debtor's assets, should pay Walter E. Heller & Company, Inc., $104,329.77 as secured by its liens on inventory and accounts receivable. The third question reported on, was as to whether Eureka Tube & Television Company was entitled to a turn-over order in the amount of $5750.-00, the value of goods which Eureka claimed were fraudulently retained by the debtor, or whether Eureka was a general creditor in that amount.

### Findings of Fact

On all these issues this Court adopts the findings of fact of the Master in the above report. Fed.Rules Civ.Proc. rule 52(a), 28 U.S.C.A.

### The Claim of the United States to a Tax Trust

■ Preliminary to a discussion of the merits concerning this issue, is the question whether the claim of the United States against the New York Trust Company would lie in this Court, in the light of the lack of jurisdiction of this Court over the latter corporation, existing solely in New York. That corporation had previously paid over to the Chapter X Trustee the entire moneys alleged by the United States to be the subject of such trust. In view of this Court's lack of jurisdiction, and the fact that the United States has a remedy by plenary suit against the New York Trust Company in New York, or in the Southern District of New York, this Court affirms the finding of the Referee that the claim of the United States against the New York Trust Company, as distinguished from its claim against the Chapter X Trustee, should be dismissed.

As to this alleged tax trust, the claim of the United States is based upon (a) the statute, (b) the order of the Referee in the Chapter XI proceeding in New York, (c) alleged general equitable principles.

(a) By the Internal Revenue Code, Title 26 U.S.C.A. § 3661, it is provided that "Whenever any person is required to collect or withhold any internal-revenue tax from any other person and to pay such tax over to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States * * *."

■ (b) In the Chapter XI proceeding in New York, the Referee entered an order "That the debtor in possession * * * is hereby directed and required to segregate and hold separate and apart from all other funds all moneys withheld from employees or collected from others for taxes under any law of the United States or of any state * * *." The Referee's order thus constituted practically a paraphrase of the terms of the above statute. Thus the statutory and court order bases of the alleged trust res are identic, with a slight exception hereafter noted. Both created a trust out of tax moneys which Tele-Tone was required to "collect or withhold" from others for payment to the United States. The requirement to withhold taxes from others clearly referred to withholding Social Security contributions from employees, and the like. This was clearly recognized by the Chapter X Trustee himself, and he admits he holds $8,396.83 as such taxes withheld from employees' wages accordingly. However, he denies that either Tele-Tone or he were "required to collect * * * any Internal Revenue tax from any other person", i. e., he claims that the balance of the moneys he holds as such Trustee was none of it subject to either such statute or such order. The claim of the United States to the contrary is, that the balance

of the approximately $85,000 received by him from the New York Trust Company, as from the Tele-Tone tax account, over and above the approximately $8,000 so "withheld", consists of the Federal manufacturers excise tax.[4] But a series of cases have settled the principle that this tax is laid upon the manufacturer alone. Lash's Products Co. v. U. S., 1928, 278 U.S. 175, 49 S.Ct. 100, 73 L.Ed. 251; Biddle v. Commissioner, 1937, 302 U.S. 573, 581, 58 S.Ct. 379, 82 L.Ed. 431; Shearer v. C. I. R., 2 Cir., 1931, 48 F.2d 552; 123 East Fifty-Fourth Street, Inc. v. United States, 2 Cir., 1946, 157 F.2d 68. Nor can there be any claim that the manufacturer is "required" by the statute to collect this tax from his vendees, or any one else. Thus the tax trust finds no basis in the statute, so far as any sums extra the withholding tax are concerned.

The only difference between the order of the New York Referee in the Chapter XI proceeding and the statute is that, while, by the order, the debtor in possession is required to "hold separate" the taxes it has "collected from others", the order does not specifically say, as the statute does, that it is "required" to collect the taxes from others. But assuming, for the sake of argument, that the order was not intended to be a mere paraphrase of the statute, but to cover taxes collected from others, even though Tele-Tone was not required so to collect them, the facts show that Tele-Tone did not collect the manufacturers excise tax, as such, from its vendees. Here it might be noted that the order, as distinguished from the statute, covered taxes so collected when imposed either by the United States or a state or its subdivision. In other words, if, as is the case generally, not only in New Jersey, but throughout the United States, a retail gasoline station carries on its signs as the price of its gasoline, not only the total price, but the amount of the tax to be paid by the purchaser, then perchance such dealer would collect such tax from others. But the facts show that Tele-Tone did no

such thing. It never showed, on the bills presented to its customers, any reference whatever to the manufacturers excise tax. True, in making up, for itself, the total price of its goods to customers, it may have included among the items constituting such total sales price, an item covering the excise tax it would ultimately have to pay, just as it included an item for rent of the premises it occupied, of the cost of the materials from which it manufactured its goods, the cost of the labor to perform such manufacture, and so on. But clearly, it has not collected from the purchasers of its goods, its rent, as rent, its labor costs, as labor costs, its material costs, as material costs. Its manufacturers excise tax was therefore not "collected from others" as a tax. Of course, the ultimate consumer ordinarily bears indirectly part or all of the economic incidence of every tax. But this is a far different thing from collecting the amount of such tax from the consumer as a tax. It it were not, then for that very reason substantially every tax imposed would be "collected from others", and such words would have no reasonable meaning whatever. Thus the claim of a tax trust as to the funds in question can not be based upon either the statute or the court order.

(c) The further claim is that the action of Tele-Tone itself, in placing these moneys in its so-called "tax account" in the New York Trust Company, of itself created a trust on general equitable principles. However, to constitute a fixed trust for the benefit of a third party, the act of the trustor must be irrevocable, with no dominion over the res left in the trustor. Ehag Eisenbahnwerte Holding Aktiengesellschaft v. Banca Nationala A Romaniei, 1954, 306 N.Y. 242, 117 N.E.2d 346; Nicklas v. Parker, Chancery 1905, 69 N.J.Eq. 743, 61 A. 267, affirmed, E. & A.1906, 71 N.J. Eq. 777, 61 A. 267, 71 A. 1135. Here the facts show that Tele-Tone had the right generally to withdraw moneys from this

4. Internal Revenue Code of 1954 § 4061 et seq., 26 U.S.C.A.

tax account. See In re Associated Gas & Electric Co., 2 Cir., 1943, 137 F.2d 607. Further, when Tele-Tone deposited moneys therein, it did not deposit moneys in such account as required by the order "not later than within the calendar week next after such collecting", but deposited moneys in round figures, not in the amount of the excise taxes it would have to pay on the goods it sold, and as such moneys conveniently came to hand. Furthermore, when these moneys came to hand they were not, in fact, payments made by purchasers for goods bought from Tele-Tone. All these payments went to the Heller Company, under the assignment by Tele-Tone to it of all the Tele-Tone accounts receivable, as security for the many thousands of dollars advanced by Heller to keep Tele-Tone in business. Obviously, these advances from Heller were in no way taxes "collected from others". Such were in fact the moneys in the account in question, save those withheld from Tele-Tone's employees. Again, since this was the character of such moneys—security belonging to Heller—it would have been unlawful, as a "preference" of one administrative claimant over another for Tele-Tone to have created a trust in such moneys for a third party, even had it intended to do so.

The Government's argument as to the inability of the manufacturer to obtain a refund from the Government of an excise tax not lawfully due, when he passes on such tax to a vendee, is too far-fetched to carry weight. The principles governing one's right to recover a refund of a tax, which is admittedly not lawfully due, and one's liability to pay the tax in the first place, are so different that it simply confuses to attempt to compare them.

■■ Nor is the claim as a tax trust strengthened by the fact that during the Chapter XI proceedings in New York, Tele-Tone drew a check payable to the Government, in a substantial amount, for excise taxes. This check was not presented for payment by the United States, until after the subsequent bankruptcy and Chapter X reorganization proceedings had taken effect. The Chapter X Trustee took title to these moneys in the bank as of the time of filing the petition. Title 11 U.S.C.A. Bankruptcy, § 110. Thereafter all property of the bankruptcy is *in custodia legis*. "Deposits in a bank to the credit of a bankrupt pass to the trustee as assets of the estate. Thus where through delay a check drawn on such a deposit prior to bankruptcy is presented and paid after bankruptcy, the payee is not entitled to retain the sum received as against the trustee. * * * The delivery of the check did not operate as an assignment or segregation of the funds on deposit, nor impress those funds with any trust in favor of the payee." 4 Collier, Bankruptcy, page 1183. In re Howe, D.C.Mass.1916, 235 F. 908. "A check of itself does not operate as an assignment of any part of the funds to the credit of the drawer with the bank * *." Negotiable Instruments Law, R.S. 7:4–6, N.J.S.A.

Thus the report of the Referee is confirmed, that the United States has a claim of $8,396.83, which is a trust fund in the hands of the Chapter X Trustee. But the balance of the tax claim of the United States is a priority claim, part an administration expense, part an ordinary tax claim, to be paid in accordance with Section 64 of the Bankruptcy Act.[5]

### The Heller Lien

During the above proceedings before the Referee and Special Master on the United States claim to a tax trust, Walter E. Heller & Co., Inc.—Heller—filed an intervening petition contending that this Government tax trust claim was invalid, and that therefore it should not affect Heller's lien previously adjudicated to be a valid one, in the amount of $104,329.77. Heller filed this petition because its claim would not be paid in full were the United States held to have a valid tax trust. But if the United States claim was not a trust, but a mere tax, or an administra-

5. 11 U.S.C.A. § 104.

tive claim, then Heller, being a secured creditor, would have prior rights in the fund and be paid in full. However, this petition by the United States to hold it entitled to a tax trust, of course did not authorize the United States to raise the altogether different issue as to the validity of Heller's lien, already adjudicated, and on notice to the United States.

Various objections have been raised by the Government and the Chapter X Trustee to Heller's claim as to its priority, as distinguished from its validity. The Government contends that Heller's lien is a "statutory lien" within the meaning of 11 U.S.C.A. § 107, sub. b and therefore subordinate to certain classes of priority claims. The Government also contends that Heller consented to the subordination of its lien to the United States claim for taxes. Both the United States and the Chapter X Trustee urge that Heller should bear its proportionate share of administrative expenses. Finally, a question has arisen before this Court as to whether interest should be allowed on Heller's claim.

(a) The Res Judicata Issue

■ In addition to the above matters, admittedly properly before this Court, the Government also belatedly raised below two other points, viz., (1) that Heller's factor's lien did not cover inventory, and (2) that the transactions between Heller and the debtor amounted to the giving of a preference. But on October 15, 1953 Referee Weelans in the Bankruptcy Court entered an order, after notice to the United States, *inter alia,* and after hearings at which testimony was taken, holding Heller's lien to be valid and fixing the amount in the sum now claimed by Heller. No appeal was taken from this order and it therefore stands as res judicata, both in bankruptcy and as to the Chapter X proceedings, since the parties in both proceedings are the same, save that the Chapter X Trustee in the one is privy to the Bankruptcy Trustee in the other. The United States points out, however, that a Bankruptcy Court has no terms, and that therefore the Referee can always, on good cause shown, reconsider a former order. But the United States has not been able to present to this Court any proof whatever that the Referee or Special Master did, in fact, reopen the above order. Although the United States was on notice both during the above hearing and after the briefs were filed that Heller relied on this order as res judicata, the United States never even filed a motion to vacate the order. Nor did the United States advance its present arguments in that regard until some time after the hearings were closed, and then only cursorily, in a reply brief. Such being the case, good cause has not been shown why this attack on the October 15, 1953 order should now be heard, not by the Court in which the order was entered, but in this Court, and particularly after the lengthy time taken by the three above insolvency proceedings has already caused substantial loss to all creditors.

■ And even if these issues were properly before this Court, on the merits they seem to have little force. The elements of a preference must be proven. In re Nizolek Furniture & Carpet Co., D. C.N.J.1947, 71 F.Supp. 1012, affirmed on opinion below, 3 Cir., 165 F.2d 788, certiorari denied sub nom. Augelli v. Ohio Finance Corp., 1948, 334 U.S. 816, 68 S.Ct. 1072, 92 L.Ed. 1746. This the Government has not done. Further, Heller must have an opportunity to defend against such proof and put in testimony of its own. In any event, even if the facts are proven, it is doubtful if the transaction between Heller and the debtor would constitute a preference. See Wolf v. Aero Factors Corp., D.C.N.Y. 1954, 126 F.Supp. 872, affirmed, 2 Cir., 1955, 221 F.2d 291.

■ The Government's other contention as to the defects in Heller's factor's lien is also without merit. The Government argues that the New Jersey factor's lien statute, N.J.S. 2A:44–179, N.J.S.A., permits liens to be secured only upon finished products and not upon goods in process. The statute provides

that "all factors shall have a continuing general lien upon all goods and merchandise from time to time consigned to or pledged with them, whether or not in their constructive, actual or exclusive occupancy or possession." The agreement between Heller and Tele-Tone provided that Tele-Tone consigned and pledged with Heller, in accordance with the Factor's Lien Law, all its goods and merchandise of every class and description. The word goods generally includes all personal chattels other than things in action and money. Sales Act, N.J.R.S. 46:30–1, N.J.S.A.; 1 Bouvier's Law Dictionary, Rawle's Third Revision; Utica Carting Storage & Contracting Co., Inc., v. World Fire & Marine Insurance Co., Inc., 277 App.Div. 483, 100 N.Y.S.2d 941, 944, 4th Department 1950. See also In re Comet Textile Co., D.C.S.D.N.Y.1936, 15 F.Supp. 963, affirmed, 2 Cir., 1937, 91 F.2d 1008. The statute itself provides, N.J.S. 2A:44–186, N.J.S.A., that it should be construed liberally, and that a substantial compliance is sufficient. So Heller's lien does cover inventory.

Turning to the questions which are properly before this Court, the Referee found: (1) Heller did not consent to the subordination of its claim; (2) Heller's lien was not a "statutory lien"; (3) Heller should pay its proportionate share of the administration expenses.

These points will be taken up seriatim.

(b) Did Heller Subordinate Its Claim?

 The United States cited certain cases on the general principle that where a secured creditor itself institutes insolvency proceedings against its debtor in order to be paid, "the tail goes with the hide." In other words, that having availed itself of the benefits of the Court's aid in realizing on its security, it can not object to the incidental disadvantages of the payment of expenses, or the delay consequent upon such administration by the Court. There can be no question as to this. But here Heller did no such thing. It did not institute the proceedings, either under Chapter XI, Chapter X, or in bankruptcy. All it did was not to attempt to stymie these proceedings by asking to realize on its security, outside the Court. Heller has done nothing to waive its right to payment out of the security which it owned, and which was carved out of the bankrupt's property before any insolvency proceedings ensued. Nor is this affected by the fact that a portion of Heller's advances, which in fact constituted practically all the assets there were to carry on the Tele-Tone business, were used to pay necessary administration expenses. This was for the benefit of all creditors, in order, if possible, to reorganize Tele-Tone under Chapter X. Furthermore, Heller knew it still had ample security over and above these moneys to meet its claim. So it would have been highly inequitable for it to have objected to the use of these moneys to carry on the business, when it did not need these moneys for its own security. Heller's failure to object to the use of the loan proceeds in part to pay administration expenses was simply a waiver of any right to those very moneys. But as to these particular moneys, since Heller had turned them over to Tele-Tone, a bankrupt, they were the bankrupt's property, and Heller had no prior right thereto. On the other hand, this waiver of its right, if any, to the loan proceeds themselves did not constitute a waiver to the security for the loan, which had been turned over to Heller as its own property.

(c) Is The Factor's Lien A "Statutory Lien"?

If Heller's lien is a "statutory lien", as the United States claims, under 11 U.S.C.A. § 107, sub. b it would be subordinate to certain priority claimants, 11 U.S.C.A. § 107 sub. c, but not if Heller's lien made it a true secured creditor.

The factor at common law was an agent employed to sell goods for a principal and receive a commission thereon. 1 Bouvier's Law Dictionary, Rawle's Third Revision page 1176. The factor had a lien on the goods for any advances made by him and for his commissions. This lien existed independently of any agreement, Id. 1177. The modern fac-

tor, however, is, as here, a financier who lends money and takes in return an assignment of the accounts receivable or some other security. Hanna, Sections 60c and 67b of the Bankruptcy Law, 25 Washington L.R. 1 (1950). By statute, in both New York and New Jersey, this modern factor, *if the parties so provide by written agreement*, is given a continuing general lien on the goods and merchandise of the debtor. Section 45, Personal Property Law of New York, McK. Consol.Laws, c. 41; N.J.S. 2A:44–178 et seq., N.J.S.A. Thus, the lien given to factors by these statutes bears little resemblance to the old common law factor's lien. The United States contends that since Heller's factor's lien is thus a creature of statute, it is therefore a statutory lien within the meaning of 11 U.S.C.A. § 107, sub. b.

■ The statute provides:

"The provisions of section 96 (preferences) of this title to the contrary notwithstanding, statutory liens in favor of employees, contractors, mechanics, landlords or other classes of persons * * * created or recognized by the laws of the United States or of any State, may be valid against the trustee (even if preferences) * * *." (Parentheses the Court's.)

In support of its contention that Heller's lien is such a "statutory lien", the Government cites as authority the above article by Hanna which suggests that Congress intended, Section 107, sub. b, to include inventory financing devices, such as factor's liens. Moore, however, differs with this, 4 Collier, Bankruptcy, 14th Edition, page 184, for several reasons:

In the first place, factor's liens are not mentioned in the classes cited as comprising "statutory liens", unless perchance they are covered by the phrase "other classes of persons" there mentioned. The familiar doctrine of *ejusdem generis* here applies, i. e., that such "other classes of persons" must be similar to the classes specifically named. But finan-

ciers are not similar to the classes named, i. e., employees, contractors, mechanics or landlords. Mechanics and contractors enhance the material assets of the bankrupt. Financiers do not. Traditionally, landlords and employees have been considered *ipso facto* to be priority creditors. But financiers are merely ordinary creditors, to whom the various states, in order to loosen the supply of credit, have given certain rights, *if the parties so agree.*

In the next place, "statutory liens" are expressly excluded by the Bankruptcy Act from ever being attacked as a preference. And since the giving of preferences by collusion has long been recognized to be one of the greatest dangers to the proper enforcement of bankruptcy, the Congress has always considered the retention of the right to attack a transfer as a preference, to be of paramount importance. This the entire legislative history of bankruptcy makes abundantly evident. Hence it is not lightly to be inferred that Congress has extended an exemption from preference to any class.

Nor do the 1950 amendments to the Bankruptcy Act support any such inference. True, Congress intended thereby to aid businessmen generally by freeing the flow of credit to a certain extent, but at the same time Congress retained control over such credit, to the extent of permitting them still to be attacked as preferences. Congress stated its purpose as to the 1950 bankruptcy amendment as to preferences, 11 U.S.C.A. § 96, subs. a, b, Bankruptcy Act, Sec. 60, as amended in 1950 by Chapter 70, Public Law 461, Laws of 81st Congress, 2d Session, as being to "remove the resultant serious doubts that now exist among banks, factors, and other extenders of credit upon the validity of security taken in good faith and for present value. The present language of the act tends to impede and choke the flow of credit, principally to small-business men, and the object of the bill is to free its channels * * *." S.R. 72 (to accompany S 88), H.R. No. 1293 (to accompany S 88), U.S.Code Congressional Service 1950, p. 1985. There-

after the Committee Report continues, after referring to certain Supreme and Circuit Court decisions "the resultant confusion has cast grave doubt upon the validity of normal business security, in all of the areas covered by trust receipts, factor's liens * * * assignments of accounts receivable * * *."

Therefore, the 1950 amendment of the preference section wiped out the previous artificial status of the Trustee in Bankruptcy as a bona fide purchaser insofar as personalty was concerned, retaining it only as to realty. But it did leave personalty transferred to a factor, and other similar consensual security agreements, subject to attack as preferences under subdivision b of the above statute. Therefore, since, both before and after the 1950 amendment, factor's liens were, under certain circumstances, subject to attack as preferences, and since "statutory liens" are never subject to attack as preferences, Congress clearly intended that factor's liens should not be considered as "statutory liens" under the Bankruptcy Act. U.S.Code of Congressional Service, Vol. 2, 81st Congress, 1950, page 1985, 1987; 3 Collier, Bankruptcy, pages 777, 907; Countrymen, Secured Transactions Article of Commercial Code and Sec. 60 of the Bankruptcy Act, 16 Law and Contemporary Problems 76, 82–86 (1951).

In short, as Professor Moore, in Collier, supra, says "The 'statutory lien' arises primarily from an economic relationship defined by the Legislature, and not from the terms of a contract provided for security." So the crux is, whether, in order to validate the lien, the parties must have expressly agreed to its existence. If so, it is not one of the "statutory liens" envisioned by the Bankruptcy Act. But if the lien depends solely upon the statute, then it is such a "statutory lien".

On principle, therefore, Heller's factor's lien, as created under either the New York or New Jersey statutes, which make essential the agreement of the parties to the lien, would not seem to be the "statutory lien" expressly referred to in the Bankruptcy Act. Nor are the authorities particularly helpful. For they deal, not with factor's liens, but with analogous situations, with results both ways, and some times by mere dictum.[6]

■ Accordingly, since both the New York and the New Jersey statutes, under which Heller's factor's lien was drawn, require the express agreement of the parties to create the lien, Heller's lien is not one of the "statutory liens" covered by the Bankruptcy Act, but an ordinary lien giving Heller the status of a secured creditor.

(d) Heller's Responsibility For Expenses

■ The Referee and Special Master allowed Heller's lien claim as above, but charged against same a proportionate "part of the expenses of preserving the property, including the advertising costs of the sale, the auctioneer's fees, the appraiser's fees, the rental for housing of the property sold, the Chapter X Trustee's fees, the Receiver's and Trustee's fees in bankruptcy, and the Referee's fees". Heller excepts to these charges. In any event, of course, the amount of

---

6. White v. Karl Kiefer Machine Co., 8 Cir., 1954, 127 F.2d 119; In re Rand Mining Co., D.C.S.D.Cal.1947, 71 F.Supp. 724, 727; Goggin v. Bank of America Nat. Trust & Savings Ass'n, 9 Cir., 1950, 183 F.2d 322, 22 A.L.R.2d 470; Tyler State Bank & Trust Co. v. Bullington, 5 Cir., 1950, 179 F.2d 755; In re Harvey Distributing Co., D.C.E.D.Va.1950, 88 F.Supp. 466. That Heller's factor's lien is not a "statutory lien" see Tyler and Harvey, holding a trust receipt, somewhat similar to a factor's lien, to be a voidable preference. But this they could not be, if they were "statutory liens". Again, in Goggin, where the bank's lien was held to be a "statutory lien", the Court noted that same arose solely by operation of law, in that particular jurisdiction, and not by the agreement of the parties, as in the case of Heller's lien. On the contrary, see White, where, without analysis, a conditional seller was held to have a statutory lien, and Rand, where, by dictum, a trust receipt was held to be a "statutory lien".

Heller's lien, met from accounts receivable, as distinguished from sale proceeds, can in no wise be considered in determining the amount of charges against Heller for sale expenses and the like.

▮ The Referee and Special Master rests these charges on the authority of Miners Savings Bank of Pittston, Pa. v. Joyce, 3 Cir., 1938, 97 F.2d 973. However, this case is distinguished in In re Street, 3 Cir., 1950, 184 F.2d 710, 711, as dealing with a situation "where there is no surplus from the sale of the mortgaged property over the debt secured by the lien", Street holding such rule inapplicable to the situation, such as exists in the case at bar, where "there was a substantial margin between the secured creditors' claim and the selling price of the property." Under such circumstances the Third Circuit, citing Reconstruction Finance Corporation v. Cohen, 10 Cir., 1950, 179 F.2d 773, to the same effect, holds "the amount due the secured creditor was" not to be reduced by such expenses. This is because, after all, the lien holder is a secured creditor, entitled to the benefit of his security, ahead of the general creditors, who, in this case, receive a surplus, itself subject to the lien of the secured creditor. Nor did the secured creditor "ask for the Bankruptcy Court's services in foreclosing their lien. It is true they did not object and thereby acquiesced in the proposition that the mortgaged property should be sold free of encumbrances. But that sale was one which the trustee was undertaking for the benefit of the general estate. * * * Where the sale is asked for, as here, by the trustees for the benefit of the general creditors we think it only fair that the estate which is to be shared by them should pay the expenses of the proceedings which was for their benefit." Such being the facts in the case at bar, the principles stated in Street apply here, the cases relied on to the contrary essentially being cases like Miners Savings Bank, where there was no surplus going to general creditors. Thus it was incorrect to impose the above charges on Heller.

In this respect, therefore, the order of the Referee and Special Master will be reversed.

(e) Interest on the Heller Claim

The cases dealing with the payment of interest to secured creditors are legion, and the conclusions reached by them, as well as by the text writers in that regard, appear to be in some conflict.[7] However, the bulk of this conflict is only apparent, and due to the difference in the facts dealt with, and the endeavor by the courts to do equity among the creditors. Upon analysis the authorities, generally speaking, would seem to have applied the following general principles, in the light

---

7. Ticonic Nat. Bank v. Sprague, 1938, 303 U.S. 406, 58 S.Ct. 612, 82 L.Ed. 926; Coder v. Arts, 8 Cir., 1907, 152 F. 943, 950, 15 L.R.A.,N.S., 372, affirmed 1909, 213 U.S. 223, 245, 29 S.Ct. 436, 53 L. Ed. 772; Sexton v. Dreyfus, 1911, 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244; American Iron & Steel Mfg. Co. v. Seaboard Air Line Ry., 1914, 233 U.S. 261, 267, 34 S.Ct. 502, 58 L.Ed. 949; Vanston Bondholders Protective Committee v. Green, 1946, 329 U.S. 156, 164, 67 S.Ct. 237, 91 L.Ed. 162; City of New York v. Saper, 1949, 336 U.S. 328, 330, Footnote 7, 69 S.Ct. 554, 93 L.Ed. 710; In re Torchia, D.C.Pa.1911, 185 F. 576, 584, affirmed 3 Cir., 1911, 188 F. 207; In re Hershberger, D.C.Pa.1913, 208 F. 94; Kagan v. Industrial Washing Machine Corp., 1 Cir., 1950, 182 F.2d 139, 146; Eddy v. Prudence Bonds Corp., 2 Cir., 1947, 165 F.2d 157, 160, certiorari denied, Prudence Realization Corp. v. Eddy, 333 U.S. 845, 68 S.Ct. 664, 92 L. Ed. 1128; In re Gotham Can Co., 2 Cir., 1931, 48 F.2d 540; Sehon-Stevenson & Co. v. Union Trust Co., 4 Cir., 1940, 113 F.2d 968; Oppenheimer v. Oldham, 5 Cir., 1949, 178 F.2d 386, 389; In re Macomb Trailer Coach, Inc., 6 Cir., 1952, 200 F.2d 611; In re Chicago, R. I. & P. Ry. Co., 7 Cir., 1946, 155 F.2d 889; Wilson v. Dewey, 8 Cir., 1943, 133 F.2d 962; United States v. Sampsell, 9 Cir., 1946, 153 F.2d 731; Board of Com'rs of Sweetwaters County, Wyo. v. Bernardin, 10 Cir., 1934, 74 F.2d 809; In re Worden, D.C.W.D.Ky.1952, 107 F.Supp. 496. Compare Vol. 3 Collier on Bankruptcy, page 1840 (14th Ed.); Remington Bankruptcy, Vol. 2, page 434 (4th Ed.); and Note 134 A.L.R. 847.

**750**

of which most of the apparent conflict disappears:

■ The underlying purpose of bankruptcy is to distribute the bankrupt's assets equitably among the creditors. By definition, therefore, assets which do not belong to the bankrupt, either at law or in equity, at the time of bankruptcy, are not the property of the Trustee in Bankruptcy, and are distributed in the bankruptcy proceedings simply as a matter of convenient remedy, in effectuation of the rights created by the security contract. Thus, when the bankrupt has lawfully assigned to a creditor certain security previous to the bankruptcy, the debtor's only interest in such security is to the surplus remaining after the payment of the debt. The security, insofar as necessary to pay the debt, has been carved out of the debtor's estate before the bankruptcy occurs. Therefore the bankruptcy Trustee, acting for the creditors, and entitled only to the property of the bankrupt, is not entitled to the security, so far as same is necessary to pay the secured debt. This is made clear by the Bankruptcy Act itself, which specifically provides that the "securities held by secured creditors shall be * * * credited upon" their claims, the bankruptcy dividend to be "paid only on the unpaid balance". 11 U.S.C.A.Bankruptcy, §§ 92, 93, subs. e, h. For the Trustee to take as his own the security previously transferred lawfully to a third party would be an unconstitutional taking.

However, this is not at all inconsistent with the right of the Trustee to any surplus of such security over that necessary to pay the debt, or with the fact that the remedy available to the secured creditor to realize on his own security may now be pursued by him in bankruptcy. Accordingly, in the relatively rare case where there is a surplus, there is no difficulty. Here, after the payment of the secured debt out of the security according to the terms of the security contract, which may well include post-bankruptcy interest, the balance remains, first for distribution among the unsecured creditors, then any surplus thereover to the bankrupt himself. To this all agree.

■ We need hardly allude to the further unanimous agreement of the authorities that, regardless of whether the security does, or does not, suffice to pay the debt and post-bankruptcy interest, any income accruing to the security itself, subsequent to the bankruptcy, may be applied, first to pay the debt due the secured creditor, including post-bankruptcy interest, the rights of the bankruptcy Trustee therein being subordinate thereto.

But, in the more usual case, that with which Sexton v. Dreyfus, supra, for instance, deals, the security is insufficient to satisfy the debt, including post-bankruptcy interest, according to the terms of the security contract. There the secured creditor has exactly the same right to use his own security to pay the secured debt, according to the terms of the security contract. This is because the security is primarily his, with only a secondary equity in the bankruptcy Trustee. But here, even after so using the security to apply first on the principal of the debt, next on its interest, possibly including that post-bankruptcy, there will be a balance due on his debt, according to the terms of the security contract. As to this balance this creditor will then be an unsecured creditor, 11 U.S.C.A. § 93, subs. e, h. Under such circumstances he must share this balance ratably with the other unsecured creditors, and for the first time resort to the assets of the bankrupt's estate. Furthermore, since he makes this claim to receive equitable treatment with the other unsecured creditors, he must have clean hands before he can ask the equitable aid of the bankruptcy court to that end. Thus he must have done nothing inequitable to the unsecured creditors generally.

■ Specifically, he must have realized on his security in a way which shall not have inequitably affected the rights of the unsecured creditors. But, if he does what the secured creditor attempted to do in Sexton, which the Supreme Court prevented him from doing, i. e., apply his security first to pay full post-bankruptcy interest on his debt, and thereafter to pay a portion of the prin-

cipal of his debt, the result would be that he would thereafter file a claim as an unsecured creditor for the balance of the *principal* of his debt. Of course, the greater the amount of the security which he applied first to pay the post-bankruptcy interest, the greater would be the deficiency on the principal and the greater would be his claim as an unsecured creditor. If he had applied his security first to the principal, and thus exhausted it, he would not have been able to prove as an unsecured creditor for the post-bankruptcy interest, because an unsecured creditor can not obtain post-bankruptcy interest. This action of the unsecured creditor in Sexton, in applying his security to pay the post-bankruptcy interest on the debt, before paying its principal, thus resulted in increasing the total amount of the unsecured claims, and in turn resulted in a smaller ratable share going to each of the unsecured creditors. This, all agree, Sexton included, is inequitable to the unsecured creditors. Therefore, in a situation where the security itself, not a part of the bankrupt's estate, is insufficient to pay both the principal of the debt and the post-bankruptcy interest, due according to the terms of the security contract in full, the security must be applied first to pay the principal, plus the interest down to the time of the filing of the bankruptcy, which is due the secured creditor under all circumstances. Only thereafter can the remainder of the security equitably be used to pay the post-bankruptcy interest. So far as the security itself suffices, when thus applied, to pay some post-bankruptcy interest, the general creditors can not object, as such security belongs, not to the bankrupt, but to the secured creditor. However, as to any balance of post-bankruptcy interest remaining unpaid after the security has been exhausted, such balance is unsecured, and would be a claim of an unsecured creditor for post-bankruptcy interest. Since post-bankruptcy interest is allowed no unsecured creditor, such claim must be disallowed.

After the Sexton decision, the Supreme Court in Ticonic Nat. Bank v. Sprague, supra, held squarely that secured creditors of a National bank were entitled to interest subsequent to the date of bankruptcy, if the assets upon which the secured creditors had a lien are sufficient to pay both principal and interest, even if such assets were not sufficient to pay other creditors in full. Nine circuits have similarly held.[8]

Nor is Sexton to the contrary. For in Sexton Justice Holmes said [219 U.S. 339, 31 S.Ct. 258]: "The view that we adopt is well presented in the late Judge Lowell's work on Bankruptcy, § 419; seems to have been entertained in Coder v. Arts, 8 Cir., 152 F. 943, 950 * * *." And the very section in Lowell's Bankruptcy which our highest court thus says 'we adopt', not only sets forth the substance of the principle above stated as applicable to cases where a deficiency in the security exists, but reads, in its opening sentence "If the security exceeds the debt, the creditor receives interest until the settlement with the assignees (the bankruptcy trustee) whether by redemption, sale or otherwise." (Parentheses the Court's)

Furthermore in Coder v. Arts, supra [152 F.2d 950], also cited by Holmes, J., the Court held: "But the proceeds of these mortgaged lands appear to be ample to pay the principal and interest of the debt to the mortgagee Arts, and where a trustee sells mortgaged property of the bankrupt's estate free of the mortgage, and the proceeds of the sale are sufficient for that purpose, the mortgagee is entitled to payment of the interest upon his mortgage debt as well as the principal, out of the proceeds in accordance with the terms of the note and mortgage." In

8. Kagan v. Industrial Washing Machine Corp., supra; Eddy v. Prudence Bonds Corp., 2 Cir., 1948, L. Hand, supra; Sehon-Stevenson & Co. v. Union Trust Co., supra; Oppenheimer v. Oldham, supra; In re Macomb Trailer Coach, Inc., supra;

In re Chicago, R. I. & P. Ry. Co., supra; Wilson v. Dewey, supra; United States v. Sampsell, supra; Board of Com'rs of Sweetwaters County, Wyo. v. Bernardin, supra.

affirming the lower court in Coder v. Arts, 1909, 213 U.S. 223, 245, 29 S.Ct. 436, 445, 53 L.Ed. 772, the Supreme Court stated: "Nor do we think the circuit court of appeals erred in holding that, inasmuch as the estate was ample for that purpose, Arts was entitled to interest on his mortgage debt." Not only does Sexton thus approve of the above principles by the clearest of inference, but in turn Saper, which approves of Sexton, cites in footnote 7, at page 330, of 336 U.S., at page 555 of 69 S.Ct., many of the English cases in turn cited by Lowell, Bankruptcy, in support of his above quoted text.

In the case at bar, the security is ample to pay both the principal of the debt and post-bankruptcy interest thereon, so Heller is entitled to be paid both. The subordinate question then remains as to whether post-bankruptcy interest on the debt should be paid Heller out of the security, till the time the Trustee receives the security proceeds, through the sale of the inventory, under the factor's lien and his collection of the balance of the assigned accounts receivable, or whether such interest should be paid down to the time the Trustee pays these moneys to Heller.

Under the general principle which governs this entire interest question, namely, that bankruptcy should not affect the security of a secured creditor, because the security is not a part of the bankrupt's assets, the authorities are uniform in permitting interest to the secured creditor up to the time of payment to him.[9]

Nor can it be argued that the delay between the sale of the security and the time of payment is attributable to Heller, so that equitably he should not receive interest during that period. Heller did not instigate the present litigation, but is merely defending its rightful claim,

previously adjudicated, to the security, against the opposing tax trust claim of the United States. No waiver or estoppel can therefore lie, to prevent Heller's recovery of interest for the period of such delay.

### The Claim of the Eureka Tube & Television Company

It is not clear whether this issue arises on the report of the Referee in Bankruptcy as such, or on a reference of the matter by this Court to the Referee, as Special Master. According to the order signed by this Court June 11, 1952, the matter was "referred to Charles H. Weelans, Referee in Bankruptcy, for hearing and determination". This indicates a reference to the Bankruptcy Court itself. If so, then, since no exceptions have been filed, the report stands.

But even if the matter is considered as referred to a Special Master for his report, the result is the same. For meanwhile Eureka itself has gone into bankruptcy, so its Trustee should have filed exceptions. Eureka's Trustee has advised this Court in writing, April 26, 1955, that he "will not file exceptions * * *." However, under such conditions this Court must act on such report, and, when we turn to the merits, the report would seem correct.

As previously stated, this Court has adopted the findings of fact in the present report as its own. These findings show that the tubes ordered from Eureka by Tele-Tone were delivered January 26, 1952. At first Eureka refused to send them unless they received a certified check. But later they waived this requirement and took an ordinary check, payment of which was refused by the bank. January 30, 1952 Tele-Tone filed its petition in the Southern District of New York, under Chapter XI.

9. United States v. Sampsell, supra; In re Hershberger, supra; In re Torchia, supra; See also Ticonic Nat. Bank v. Sprague, supra; Oppenheimer v. Oldham, supra; In re Chicago, R. I. & P. Ry. Co., supra; Wilson v. Dewey, supra; San Antonio Loan & Trust Co. v. Booth, 5 Cir., 1924, 2 F.2d 590; Sehon-Stevenson & Co. v. Union Trust Co., supra.

Not only does the above indicate a waiver by Eureka of its original insistence on being paid before delivery of the goods, but the delivery and receipt of the ordinary check constitutes no assignment in, or trust for, Eureka of the amount of the check, let alone the goods themselves. This is indicated by the authorities cited supra under the United States tax trust claim. Furthermore, there is no evidence that these tubes ever came into the possession of either the debtor in possession, the Chapter X Trustee, or the Bankruptcy Receiver or Trustee instead of being shipped out by Tele-Tone previously, engaged in quantity production as it was. In the absence of such evidence, these fiduciaries are not shown to have ever had possession of property belonging to Eureka, and not to the bankrupt, even in the absence of any such waiver.

The finding of the report, that the claim of Eureka is a general claim, is therefore affirmed.

The Referee and Special Master's report is therefore affirmed with the exception of the charging of administrative expenses against Heller.

An order may be entered accordingly.