EHAG EISENBAHNWERTE HOLDING AKTIENGESELLSCHAFT, Appellant, *v.* BANCA NATIONALA A ROMANIEI (NATIONAL BANK OF ROUMANIA), Respondent.

Argued October 16, 1953; decided January 14, 1954.

*Henry I. Fillman* and *Otto C. Sommerich* for appellant.   I. By its agreement with the Roumanian Ministry of Finance, defendant expressly obligated itself to pay the bond interest and make the sinking fund payments.   The agreement was made or intended for the benefit of the bondholders and, therefore, plaintiff has a cause of action against defendant upon defendant's failure to pay the bond interest and make the sinking fund payments with the funds received by it for such purposes. (*Lawrence* v. *Fox,* 20 N. Y. 268; *Vrooman* v. *Turner,* 69 N. Y. 280; *Seaver* v. *Ransom,* 224 N. Y. 233; *Filardo* v. *Foley Bros.,* 297 N. Y. 217.)   II. Since the Roumanian Government deposited with defendant the funds required for the bond interest and sinking fund payments and parted with control over these funds, plaintiff has a cause of action against defendant upon the latter's failure to pay the bond interest and make the sinking fund payments in accordance with the agreement made by it. (*Rogers Locomotive & Mach. Works* v. *Kelley,* 88 N. Y. 234; *Sayer* v. *Wynkoop,* 248 N. Y. 54; *Staten Is. Cricket & Baseball Club* v. *Farmers' Loan & Trust Co.,* 41 App. Div. 321.)   III. Since the bonds provide for payment of principal and interest, at the option of the holder, in pounds sterling in London or in dollars in New York, the demand by plaintiff for payment in dollars in New York fixed New York as the place of performance, and upon defendant's failure to pay dollars in New York, as demanded, a cause of action against defendant arose in New York in plaintiff's favor.   (*Lann* v. *United Steel Works Corp.,* 166 Misc. 465; *Pan-Amer. Securities Corp.* v. *Fried, Krupp AG.,* 169 Misc. 445, 256 App. Div. 955; *South Amer. Petroleum Corp.* v. *Colombian Petroleum Co.,* 177 Misc. 756.)   IV. Since plaintiff is entitled, in any event, to sue for and recover on the matured

interest coupons for the years 1940 and 1941, the warrant of attachment was properly issued. (*Cohen* v. *Walker,* 38 Misc. 114; *Sulzbacher* v. *Cawthra,* 14 Misc. 545.) V. Upon a motion to vacate an attachment, based upon insufficiency, the merits of the action will not be determined, and the original papers upon which the warrant of attachment was issued do not clearly indicate that plaintiff must ultimately fail. (*Wulfsohn* v. *Russion Federated Soviet Republic,* 234 N. Y. 372; *Jones* v. *Hygienic Soap Granulator Co.,* 110 App. Div. 331; *Bard-Parker Co.* v. *Dictograph Products Co.,* 258 App. Div. 638; *Auerbach* v. *Grand Nat. Pictures,* 176 Misc. 1031, 263 App. Div. 712; *Bernstein* v. *Van Heyghen Freres S. A.,* 163 F. 2d 246; *Crook* v. *Lipton,* 182 App. Div. 838.)

*Harold W. Bissell* and *Thomas L. McGannon* for respondent appearing specially. I. The attachment papers show no obligation of defendant to or for the benefit of plaintiff with respect to the actual service of the consolidation bonds (by coupon payments and amortization). (*Lawrence* v. *Fox,* 20 N. Y. 268; *Staten Is. Cricket & Baseball Club* v. *Farmers' Loan & Trust Co.,* 41 App. Div. 321; *Erb* v. *Banco di Napoli,* 243 N. Y. 45; *Noyes* v. *First Nat. Bank of N. Y.,* 180 App. Div. 162; *Nacional Financiera, S. A.,* v. *Speyer,* 261 App. Div. 599.) II. The attachment papers show no obligation and no breach of any obligation of defendant for the benefit of plaintiff with respect to any intermediate step in the over-all servicing procedure. (*Hardie* v. *Bent Milk Food Corp.,* 207 App. Div. 513, 238 N. Y. 608; *Hilton* v. *Guyot,* 159 U. S. 113; *McCarthy* v. *Reichsbank,* 259 App. Div. 1016, 284 N. Y. 735.) III. The attachment papers fail to show any cause of action against defendant for the principal amount of the bonds (whether or not they show any cause of action for coupon interest). (*Hall* v. *Nassau Consumers Ice Co.,* 260 N. Y. 417.) IV. The attachment papers not only fail to show any reason for a trial, but affirmatively show that plaintiff could not succeed. (*Makepeace* v. *Dilltown Smokeless Coal Co.,* 179 App. Div. 60; *Grassi* v. *La Sociedad Bancaria Del Chimborazo,* 213 App. Div. 629; *Miller Bros. Constr. Co.* v. *Thew Shovel Co.,* 248 App. Div. 150; *Lamborn* v. *Lake Shore Banking & Trust Co.,* 231 N. Y. 616.)

FULD, J. Plaintiff, a Swiss corporation, sues as the holder of a substantial number of negotiable coupon bonds issued by the Kingdom of Roumania. Begun by issuance of a warrant of attachment, the action seeks to recover from defendant bank, a Roumanian corporation, damages stemming from the asserted breach of an agreement between defendant and the Roumanian Government, in connection with the servicing of such bonds. Upon a motion by defendant, appearing specially, the court at Special Term vacated the warrant of attachment, holding that the papers upon which it had been granted did not establish a prima facie cause of action. The Appellate Division affirmed, and plaintiff's appeal is here, by leave of that court, upon a certified question.

The bond issue, known as the "Roumanian Four Percent Consolidation Loan of 1922," was in the total authorized face amount of 35,000,000 pounds sterling, or 175,000,000 gold dollars, maturing in 1968. Each of the bonds made reference to a General Bond and to certain laws specially enacted by the Roumanian Government. Interest was payable semiannually at the rate of 4% a year, and provision was made for amortization of principal by means of a Cumulative Sinking Fund. The Roumanian Government undertook to service the bonds by specified semiannual payments, in pounds sterling or gold dollars, to named financial agents, and it was they who were to apply the same to the payment of interest and the maintenance of the sinking fund. The General Bond named the British Overseas Bank, Ltd., as "the financial agents of the Government for the service of the said Bonds," and designated it as "Trustees for the Bondholders" for the purpose of receiving the payments for the servicing of the bonds. The funds accumulated in the sinking fund were to be used for retirement of the bonds, either by purchases made on the market at less than par or by redemption of bonds drawn by lot.

The law authorizing the issuance of the bonds announced that payments of interest and amortization of principal were to be "effected" from a special fund into which the government was to pay all export taxes as long as such taxes were in force. And the individual bonds, as well as the General Bond, recited that the government was charging the gross proceeds of present

and future export taxes for the payment of such interest and amortization. The individual bonds further obligated the government to make up any deficiencies out of its general revenues and assets. And the government's Ministry of Finance was also authorized to enter into a certain agreement, termed a " Convention," with the defendant Roumanian National Bank, whereby the ministry was to turn over to the bank the export taxes collected, as well as any additional amounts necessary to cover the interest and amortization of the bonds, plus 10%. Such funds, it was further specified, were to be kept in " a special account."

In addition, Article 4 of the agreement recited, generally, that the bank " obligates itself to make all payments out of the above-mentioned transfers to it, and to procure the necessary foreign exchange ". The specific duties assumed by the bank were set out in Article 6. The bank, it was stipulated, would " assume the task of converting the various remittances * * * into the currency required to cover the various loans ", " *following the instructions given by* " the Ministry of Finance. The corresponding value in pounds sterling was then to " be deposited in full at the Bank of England, wherefrom, *in accordance with the directives of the Ministry of Finance* * * * the required remittances* " would be made to the British Overseas Bank and its subagents.

In the event that the Roumanian National Bank was itself unable to obtain funds to make payments abroad, the ministry was to procure such funds " by organization of the export of payment media." The bank was also privileged to make use of its available funds abroad for that purpose, in which event the government would be obligated to repay it, with interest. The bank was likewise required to account to the ministry for the maintenance of the fund, and any sums remaining after the payment of interest and amortization, plus 10%, were to be placed at the disposal of the ministry, which, however, was empowered to dispose of the fund only in accordance with the Convention.

Up to 1933, the Roumanian Government complied with its obligations by depositing the necessary funds with the bank, and the bonds were duly serviced. In August of 1933, the

Roumanian Council of Ministers adopted a resolution authorizing the Minister of Finance to suspend the transfer abroad of any amounts due on the government's foreign obligations and providing that the government " shall deposit the amount due " with the bank " in lei and shall be considered by virtue of this deposit as released from their obligations until the creditor states make it possible, by facilitating business relations, to obtain the necessary foreign exchange for the carrying-out of the transfer." The Minister of Finance thereupon instructed the bank " to act accordingly."

Plaintiff's complaint and moving papers allege that the Roumanian Government thereafter continued, in accordance with that resolution, to make deposits of lei with the bank up to and including October 1, 1941, but that the bank failed to service the bonds. There does not, however, appear to be any showing — other than allegations on information and belief — of any such deposits after 1937. In May, 1941, the Ministry of Finance, through the Roumanian Legation in this country, announced the suspension abroad of the servicing of its foreign debt.

This suit, following a demand made upon defendant bank for the payment of the face amount of plaintiff's bonds and of its 1940 and 1941 interest coupons, is predicated on defendant's failure to procure and transmit the foreign exchange necessary for the servicing of the bonds for the years 1940 and 1941.[1] It is plaintiff's claim, first, that the bondholders are third-party beneficiaries of defendant's agreement with the government and, second, that the government's deposit of the funds with defendant constituted an absolute and irrevocable appropriation of such funds to the payment of interest and amortization on the bonds. As stated, the courts below vacated the warrant of attachment, upon the ground that no prima facie cause of action was shown.

---

1. There being, however, no substantiation of the allegations, on information and belief, that defendant received funds from the government for 1940 and 1941, it is questionable whether there is, in any event, sufficient proof of a cause of action necessary to sustain a warrant of attachment. (Civ. Prac. Act, § 903; see *Zenith Bathing Pavilion* v. *Fair Oaks S. S. Corp.*, 240 N. Y. 307, 311; *Murphy* v. *Jack,* 142 N. Y. 215, 217–218; *Hart* v. *Page Mfg. Co.,* 187 App. Div. 296, 297–298.)

Whether defendant is liable to the bondholders by reason of its contract with the government or its receipt of moneys thereunder, must be determined by reference to the law of Roumania, the place where the contract was made and where the moneys were received. (See *Swift & Co.* v. *Bankers Trust Co.,* 280 N. Y. 135, 141, 145; see, also, Restatement, Conflict of Laws, § 332, subd. [f]; § 346.) Neither party has briefed the Roumanian law, and, since the common law is not in effect in Roumania, we may not presume that its law is the same as ours. (See *Sonnesen* v. *Panama Transport Co.,* 298 N. Y. 262, 267; *Cuba R. R. Co.* v. *Crosby,* 222 U. S. 473, 479; see, also, Restatement, Conflict of Laws, § 623.) Be that as it may, though, we need not consider or decide to what extent reference may, nevertheless, be made to the pertinent principles of our own internal law,[2] in view of our conclusion that plaintiff's proof would not, in any event, establish a cause of action under New York law.

The various bond documents and the agreement between the bank and the government clearly establish that no duty was imposed upon, or assumed by, the bank, to make any payments whatsoever to the bondholders. The specific provisions of the agreement fixing the bank's duties (Art. 6) make it manifest that the bank assumed only the function, under the government's direction, of securing the necessary foreign exchange and arranging for its transmission, first, to the Bank of England and, then, to the British Overseas Bank and its subagents. The duty of making payments to the bondholders was placed, not on defendant, but on British Overseas. Indeed, the primary obligation assumed by the government, as provided in the General Bond, was to pay each half year's installment of the fund, necessary for interest and amortization, to British Overseas.

Although the agreement between the government and defendant bank denominated the amounts deposited as " a special fund for a specific purpose," there is no doubt that control of

---

2. Compare *Crashley* v. *Press Pub. Co.,* 179 N. Y. 27, 32–33; *Riley* v. *Pierce Oil Corp.,* 245 N. Y. 152, 154; *Ozanic* v. *United States,* 165 F. 2d 738, 744, with *Savage* v. *O'Neil,* 44 N. Y. 298, 301, and with *Parrot* v. *Mexican Central Ry. Co.,* 207 Mass. 184; *Whitford* v. *Panama R. R. Co.,* 23 N. Y. 465, 467–468; *Gerli & Co.* v. *Cunard S. S. Co.,* 48 F. 2d 115, 117; 3 Beale on Conflict of Laws, § 622A. 2.

the various funds was at all times retained by the government — at least until their equivalent in pounds sterling reached British Overseas. Thus, all steps between the initial deposit in defendant bank and the ultimate remission to British Overseas were explicitly made subject to the "instructions" and "directives" of the Ministry of Finance. Moreover, there was no certainty that the funds deposited by the government with defendant would be used to obtain the necessary foreign exchange. Both the agreement — in Article 5 — and the individual bonds thus specifically prescribed that, in the event of defendant's inability to procure "funds to make payments abroad the Ministry of Finance shall procure such funds by organization of the export of payment media." The agreement (Art. 5) further permitted defendant to make use of its available funds abroad to secure the necessary foreign exchange, subject to repayment, with interest, by the government. That the government did not part with its entire interest in the funds, was evidenced by a further provision of the agreement — in Article 9 — that any interest which defendant might receive from its correspondents on the amounts deposited by the Ministry of Finance, would be credited, not to defendant or to the special fund, but to the Ministry.

Clearly, then, up to the point that the sterling equivalent of the funds reached British Overseas, the government, through the agency of defendant bank, was fulfilling its primary obligation of making payment of the stipulated semiannual installments to the bondholders' designated trustee. Defendant's undertaking was simply to take one of the steps leading to performance by the government of its own separate obligation to the bondholders.

It is settled that a deposit of moneys in a bank by a corporate or governmental debtor, with instructions to pay maturing bond interest coupons of the depositor, does not ordinarily create a trust for the benefit of the bondholders or give rise to any cause of action in their favor against the bank. It merely creates a debtor-creditor relation between bank and depositor, coupled with an agency on the part of the bank to make the prescribed payments. (See *Erb* v. *Banco di Napoli*, 243 N. Y. 45, 48-49; *Noyes* v. *First Nat. Bank of N. Y.*, 180 App. Div. 162, affd. 224 N. Y. 542; *Carr* v. *Yokohama Specie*

*Bank,* 272 App. Div. 64, 66, affd. 297 N. Y. 674; *Nacional Finan-ciera, S. A.,* v. *Speyer,* 261 App. Div. 599; *Staten Is. Cricket & Baseball Club* v. *Farmers' Loan & Trust Co.,* 41 App. Div. 321; see, also, 2 Williston on Contracts [Rev. ed., 1936], § 351; 4 Corbin on Contracts [1951], § 779F.) The fact that the moneys are deposited in a special account for the specified purpose calls for no different conclusion. (See *Noyes* v. *First Nat. Bank of N. Y., supra,* 180 App. Div. 162, affd. 224 N. Y. 542; *Staten Is. Cricket & Baseball Club* v. *Farmers' Loan & Trust Co., supra,* 41 App. Div. 321; see, also, *Erb* v. *Banco di Napoli, supra,* 243 N. Y. 45, 49.)

Plaintiff, however, contends that those decisions are here inapplicable, upon the ground that defendant Roumanian National Bank expressly promised to pay the deposited moneys to the bondholders. What the precise operative effect of such a promise by a bank might be (cf. *Erb* v. *Banco di Napoli, supra,* 243 N. Y. 45, 48-49), whether such an agreement would have significance only insofar as it might tend to indicate that the depositor intended to part with all control over the funds and to constitute the bank a trustee or agent for the designated payee (cf. *Sayer* v. *Wynkoop,* 248 N. Y. 54, 57-58), need not now concern us. In the present case, the facts are, first, there was no promise on the part of defendant to pay bond-holders and, second, there was no breach by defendant of the agreement which it actually did make.

Defendant's obligation to procure the necessary foreign exchange and to transmit it to the Bank of England was expressly made subject to the directions of the government. Defendant was neither required nor authorized to effect the requisite conversion in the absence of instructions from the government, and, surely, not in contravention of them. When, there-fore, the government suspended the transfer of all foreign exchange and notified defendant '' to act accordingly,'' defend-ant had no authority to proceed any further. Certainly, it may not be said to have breached its contract simply by following the government's directions. (See *Erb* v. *Banco di Napoli, supra,* 243 N. Y. 45, 50.)

Moreover, all that defendant had arranged to do was to perform a service for the government which would enable it to fulfill its own separate obligation to the bondholders. Accord-

ingly, it is highly questionable whether the bondholders may be regarded as more than incidental beneficiaries of the agreement between the bank and the government, and as such without standing to claim any rights thereunder. (See *Hardie* v. *Bent Milk Food Corp.*, 207 App. Div. 513, affd. 238 N. Y. 608; *Matter of Connecticut Co.*, 95 F. 2d 311, 314; see, also, 4 Corbin, *op. cit.*, § 779D.)

The delivery of moneys by one person to another, with instructions that they be paid to a third person, may be effectual to create a trust for the latter's benefit, but only where the depositor's '' manifested intention read in connection with all the circumstances of the case indicates that the delivery was to be a finality, that the money * * * was to be from that moment dedicated to the use of the third person ''. (2 Williston, *op. cit.*, p. 1035.) On the other hand, no trust results, if '' the use of the money or property was intended to be subject to the directions of the person delivering it '' or '' if the holding was for his benefit and under his orders ''. (*Ibid.*; see, also, *Sayer* v. *Wynkoop, supra,* 248 N. Y. 54, 57, 59.) Thus, a trust may be created where moneys — held by a depositary as a sinking fund for the redemption of bonds — are irrevocably appropriated for that purpose and are not under the dominion of the depositor. (See *Brown* v. *Morgan & Co.*, 265 App. Div. 631, affd. 295 N. Y. 867.) And a trust may likewise arise upon the payment of moneys to a depositary charged with the function of paying interest on bonds, where the moneys are specifically received in trust for that purpose, free from further control by the depositor. (See *Rogers Locomotive & Mach. Works* v. *Kelley,* 88 N. Y. 234.)

In the present case, a trust might have come into existence, if and when the sterling equivalent of the funds in question had reached British Overseas, which was actually charged as trustee with the duty of applying the funds to the payment of interest and the maintenance of the sinking fund. But, up to that time, the government itself retained control over the funds furnished by it; there was no final appropriation of the funds merely upon the deposit with defendant, for it was not charged with the duty of paying interest or maintaining the sinking fund. Its function or duty was merely to act as agent for, and on behalf of, the govern-

ment, and subject to its directions, in converting the Roumanian currency into foreign exchange and effecting its transmission to the bank which was to make payment to the bondholders. Indeed, the government had the privilege, as well as the duty, to obtain the requisite foreign exchange itself, in the event of defendant's inability to do so. Certainly, there is no basis for the claim that defendant received the funds as trustee to pay to bondholders, in the absence of instructions from the government and in disregard of the provisions vesting in the government control and supervision of the entire process of transmitting the funds to British Overseas.

Plaintiff further contends that the government parted with all control over the funds, when it deposited the moneys in lei under the suspension resolution of 1933 (*supra,* pp. 247–248). Quite obviously, that resolution may not be read either as a blanket authorization to defendant to transfer the funds or as a surrender by the government of control over their disposition. Its clear import was only that the deposit of the moneys was to be considered a fulfillment of the government's obligations *until* the necessary foreign exchange would be available. No inference may be drawn that the government intended to part with control or permit defendant to nullify the very purpose underlying the resolution.

In sum, then, since plaintiff's complaint and moving papers fail to establish a prima facie cause of action, the attachment was properly vacated. (See *American Reserve Ins. Co.* v. *China Ins. Co.,* 297 N. Y. 322, 325, and cases there cited.) The order appealed from should be affirmed, with costs, and the certified question answered in the affirmative.

LEWIS, Ch. J., DESMOND, DYE and FROESSEL, JJ., concur with FULD, J.; CONWAY and VAN VOORHIS, JJ., concur in result upon the ground that there is no substantiation of the cause of action for the principal nor of allegations in the complaint made upon information and belief, that any funds were received by defendant applicable to 1940 or 1941 interest coupons, by reason whereof the action is brought.

Order affirmed, etc.