**POIRIER & McLANE CORPORATION,**
**Appellee,**

v.

**COMMISSIONER OF INTERNAL**
**REVENUE, Appellant.**

**No. 15, Docket 76–4062.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 6, 1976.

Decided Nov. 23, 1976.

Mansfield, Circuit Judge, filed a dissenting opinion.

Robert A. Bernstein (Gilbert E. Andrews, Jr., John G. Manning, Attys., Scott P. Crampton, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D. C., on the brief), for appellant.

Edward S. St. John, Port Washington, N. Y. (St. John & Dougherty, Port Washington, N. Y., on the brief), for appellee.

Before KAUFMAN, Chief Judge, and MANSFIELD and MESKILL, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

In 1964, Congress enacted § 461(f) of the Internal Revenue Code to achieve a more equitable and rational matching of liability disbursements and receipts for accrual basis taxpayers. It permitted deduction of a liability, even if contested, provided a transfer was made in that tax year to satisfy the claimed liability. The Internal Revenue Service, to effectuate the statutory intent and avoid potential abuse, promulgated Regulation 1.461–2(c)(1)(ii). It permitted a taxpayer to obtain a deduction by transferring money:

> . . . to an escrowee or trustee pursuant to a written agreement (among the escrowee or trustee, the taxpayer, and the person who is asserting the liability) . . .

We are called upon to decide whether a transfer of funds to a trustee for payment of an asserted liability sometime in the future was deductible under the Regulation, although the claimants were concededly not parties to the agreement. We must also decide whether the requirement of such assent faithfully interprets the intent of the statute. We believe the Regulation plainly requires the person asserting liability to be a party to the trust agreement. Because we are convinced the Regulation contributes to the fairness of the tax structure by limiting § 461(f) to its intended scope, and is designed to forestall potential abuses, we uphold its validity. Accordingly, we reverse the Tax Court's allowance of a deduction for this payment and remand for a calculation of tax liability.

A concise narration of the facts, which are not disputed, will aid in the consideration of the legal issue. Poirier & McLane Corporation, an accrual basis taxpayer, was a contracting firm specializing in road, bridge and tunnel construction.[1] In Janu-

---

1. At the time this case came before the Tax Court, Poirier & McLane, because of business reversals, was in the process of liquidation.

ary, 1956, the company received a contract from the New York City Transit Authority to reconstruct a subway tunnel and enlarge a subway station in Brooklyn. The Corporation undertook to indemnify the Transit Authority for all claims arising out of the work performed. By the time the project had been completed, several owners and tenants of property in the vicinage of the construction site had filed negligence and trespass suits against the company. The claims aggregated $581,150.

In October 1958, Poirier & McLane secured from New York State a contract to act as general contractor for the construction of a parkway in Yonkers. The agreement contained the familiar indemnification provision. Poirier & McLane engaged a subcontractor, Raymond Concrete Pile Co., to install the road support pilings. It was charged that the subcontractor performed this work improperly, and by driving pilings into an apartment building adjacent to this construction permanently damaged its foundation. In 1960, the building's owner, Bronxville-Palmer, Ltd., sued Poirier & McLane, Raymond Pile, and the State of New York for negligence and trespass seeking $14,200,000 in damages.

Although Poirier & McLane was insured for aggregate negligence claims up to $500,000, its policy did not cover liability for trespass. Consequently, the company's counsel advised that a reserve be set aside to enable Poirier & McLane to pay possible judgments on the uninsured tort claims. Poirier & McLane's accountant suggested also, that this segregation of funds could be accomplished and an immediate tax deduction taken by placing the money in a trust for the payment of asserted liabilities arising from the Yonkers and Brooklyn construction contracts. Accordingly, Poirier & McLane entered into a trust agreement with Manufacturers Hanover Trust Company. Manufacturers Hanover, as trustee, received $1,100,000 (in a certificate of deposit and Treasury bills), to be held in trust for the sole purpose of paying taxpayer's obligations on the pending claims and which were allocated in the following manner:

|  | Claim | Reserve |
| --- | --- | --- |
| The Yonkers Construction | $14,200,000 | $900,000 |
| The Brooklyn Construction | 581,150 | 200,000 |

The agreement provided that Manufacturers Hanover would return the balance of the fund after disposition of the claims:

. . . on the statement of the Settlor that the claims, for the satisfaction of which this transfer has been made, have been determined and disposed of.

In its 1964 tax return, Poirier & McLane, an accrual basis taxpayer, deducted $1,100,000, on the ground that its transfer of money to the trust constituted payment of a "contested liability", deductible under 26 U.S.C. § 461(f). On January 20, 1972,[2] a statutory notice of deficiency was issued to Poirier & McLane, disallowing the deduction and requesting payment of $624,485.37 in additional tax. On April 14, 1972, Poirier & McLane filed a petition in the United States Tax Court, challenging the disallowance and denying the existence of a deficiency[3] and by a divided court it ruled against the Commissioner.[4]

None of the claimants in any of the pending actions signed this trust agreement, nor

---

2. By agreement, issuance of the notice of deficiency was delayed until a final decision was rendered in the Bronxville-Palmer litigation.

3. In October 1969, Poirier & McLane notified Manufacturers Hanover that all claims enumerated in the trust agreement:

. . . have been disposed of by final judgment or by compromise and settlement.

On April 15, 1965, a jury found Poirier & McLane not liable for the claims asserted by Bronxville-Palmer. On September 8, 1969, the New York Court of Claims awarded Bronxville-

Palmer $11,600, plus interest on one of its negligence claims against New York. The record does not reveal the results of the Brooklyn litigation. Subsequent litigation dealt primarily with the appropriate interest to be paid by New York. *Bronxville-Palmer v. State of New York*, 34 A.D.2d 714, 309 N.Y.S.2d 672, 673 (3d Dept. 1970), *rescinded*, 36 A.D.2d 10, 318 N.Y.S.2d 57 (3d Dept. 1971), *modified* 30 N.Y.2d 760, 333 N.Y.S.2d 422, 284 N.E.2d 577 (1972).

4. 63 T.C. 570 (1975).

were they notified of the existence of the trust. This failure has spawned the legal issue which caused the serious division in the Tax Court.

Judge Featherston, writing for the majority, concluded that Regulation 1.461–2(c)(1)(ii) did not require the persons asserting liability to be parties to the trust agreement. Accordingly, he allowed the deduction of the $1,100,000 placed in trust in 1964. Judge Forrester, in an opinion joined by four other judges, concurred in the result, but added that if the Regulation did contain such a requirement, they would declare that portion of the rule invalid. Judge Hall, in a dissenting opinion joined by three other judges, argued that the claimants assent was required by the Regulation, and that this requirement was a reasonable interpretation of the statutory intent of § 461(f).

## I.

■ An understanding of the Congressional purpose in enacting § 461(f)[5] is essential before we can determine the appropriate interpretation to be given Regulation 1.461–2(c)(1). The legislative history of § 461(f) plainly reveals that the statute was designed to reestablish and slightly enlarge a narrow exception to the general rules of tax accounting for accrual basis taxpayers, by allowing payments of contested liabilities to be deducted in the year actually paid.

■ Generally, an accrual basis taxpayer may deduct a liability expense only in "the taxable year in which all events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy".[6] Where a liability is contingent on the outcome of a contested lawsuit, it is apparent that neither the fact or amount of the expense would be reasonably ascertained, and consequently the expense would not be deductible. *Dixie Pine Co. v. Commissioner,* 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270 (1943), *Lucas v. American Code Co.,* 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538 (1930).

Until 1960, however, contested tax liabilities actually paid in a given year constituted a narrow exception to this general rule. *Chestnut Sec. Co. v. United States,* 62 F.Supp. 574, 576, 104 Ct.Cl. 489 (1945), G.C.M. 25298, 1947–2 C.B. 39. The Court of Claims noted "It is hardly conceivable that a liability asserted against [the taxpayer], which he has discharged by payment, has not yet "accrued" within the meaning of the tax laws . . ."

This narrow exception to general accrual rules was eliminated by the Supreme Court in *United States v. Consolidated Edison,* 366 U.S. 380, 81 S.Ct. 1326, 6 L.Ed.2d 356 (1961). In *Consolidated Edison,* the company, an accrual basis taxpayer, paid an asserted real estate tax under protest to avoid seizure and sale of its property. Although the corporation continued to challenge a portion of the putative tax bill in court, it deducted the entire deficiency in the year paid. The Supreme Court disallowed the deduction for the contested liability holding that with respect to it, all events determining the fact and amount of the obligation had not yet occurred.

In enacting § 461(f) Congress intended to disapprove this unreasonable application of accrual rules. It allowed payments, by both cash and accrual basis taxpayers, to be deductible in the year of transfer. The stat-

---

**5.** 26 U.S.C. § 461(f) states:
(f) Contested liabilities.—If—
(1) the taxpayer contests an asserted liability,
(2) the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability,
(3) the contest with respect to the asserted liability exists after the time of the transfer, and

(4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer (or for an earlier taxable year),
then the deduction shall be allowed for the taxable year of the transfer. This subsection shall not apply in respect of the deduction for income, war profits, and excess profits taxes imposed by the authority of any foreign country or possession of the United States.

**6.** Reg. 1.461–1(a)(2).

ute became applicable to all contested liabilities, not merely tax payments, and was intended to "realistically and practically match receipts and disbursements attributable to specific taxable years." 1964 *U.S. Code Cong. and Adm.News* p. 1773. It was Congress's belief that deduction of the payment in the year "actually made" provided a more realistic reporting of income for tax purposes. In effect, § 461(f) enabled the accrual taxpayer to treat payment of contested liabilities, in appropriate circumstances, as two separate tax events. A deduction was authorized when payment was made, and any subsequent refund was treated as income.

Of course, there is no indication that Congress intended to provide a deduction by simply establishing a contingent liability reserve. Thus, the Senate Supplemental Report[7] clearly stated that a mere entry on the taxpayer's books, the purchase of a bond to secure eventual payment of a judgment, or transfer of funds to an account within the taxpayer's control did not qualify for a deduction. In contrast, the Report indicated that payments to an escrow agent, which placed the assets beyond the control of the taxpayer, were deductible. It is apparent from the legislative history that Congress envisioned the application of § 461(f) to instances resembling that presented in *Consolidated Edison*, where payment had been "actually made". By satisfying the asserted claim, the taxpayer fixed the fact and amount of its liability in that taxable year. Thus, accrual of the liability was warranted.[8]

Payments pursuant to an escrow agreement, in most instances, are made after the parties have disposed of many of the contested aspects in the case and only a limited legal issue remains for resolution. Often, such settlements are made after a *nisi prius* determination of liability and damages, where all that remains open to the losing party is the right to appeal. In such circumstances, we can see little to distinguish a payment to an escrow account from an advance payment of a contested tax liability.

■ Payments to trusts are not mentioned in the legislative history of § 461(f), for prior to its enactment, there were no tax or any other advantages to be gained by creating a trust to pay contested liabilities. Litigation reserves could be more easily established on the corporation's books at lesser expense, or by transfer of funds to a specified bank account. The issue in this case, however, is whether Poirier & McLane's unilateral transfer of assets to a reserve held in trust is the equivalent of payment to an escrow account. In sum, does it constitute a tax event that warrants accrual of the liability and tax deduction in the year of transfer? We believe it does not.

Our dissenting brother, in effect, arrives at the opposite conclusion by announcing that "the important condition precedent" in determining if a payment is deductible under § 461(f) is whether the transfer is made "beyond the taxpayer's control." But this overlooks the key consideration that the timing and amount of such transfers may still be entirely within the discretion of the taxpayer, as they were in this case. We do not believe a transfer effectuates the statutory purpose to "realistically match receipts and disbursements for specific taxable years," merely because the funds are placed beyond the taxpayer's immediate control. The phrase our brother refers to appears only in the legislative history dealing with escrow accounts which, as we have indicated, closely resemble direct payments. Nor does the dissenting opinion tell us why the unilateral transfer of funds to a trust unknown to the claimants, sufficiently re-

---

7. 1964 U.S.Code Cong. and Adm.News, p. 1913.

8. The dissenting opinion does not seem to comprehend our observation that a contested liability is reasonably fixed and ascertainable when actually paid. This does not, of course, mean, nor did we say, the liability is no longer contin-

gent. *Con Edison* provides the paradigmatic case. The company's payment of the asserted tax assessment was an event that made the liability sufficiently ascertainable to allow accrual in that year. Nonetheless, the liability remained contested, and thus, contingent.

sembles direct payment of the liability or the typical payment of contested funds to an escrow account so that it would deserve deductibility under § 461(f).

## II.

The Commissioner closely followed the outlines of the Senate Report in promulgating Reg. 1.461–2(c)(1).[9] The Regulation provided that deductions were only permitted for payments to trusts that resembled the escrow agreement specifically described by Congress. It assimilated the two arrangements, by stating that a taxpayer may provide for satisfaction of a contingent liability by a transfer "to an escrowee or trustee pursuant to a written agreement (among the escrowee or trustee, the taxpayer, and the person who is asserting the liability)."

The language in the Regulation is clear that an essential requirement for deduction is that the claimants must agree to the establishment of the trust. This requisite forms an integral part of the Regulation, and effectuates the intent of § 461(f). And

there is a sound reason for this because the agreement of all the parties, in effect, is the equivalent of a direct payment of the asserted claim. It fixes the fact and amount of the liability in a single taxable year, warranting deduction of the payment as a distinct tax event.

The wisdom of this Regulation is manifested by the facts of this case. Poirier & McLane has failed to offer any reason to regard 1964 as the year its liability accrued. The claims against it had been filed more than four years earlier. The only significant event occurring in that year was the Corporation's unilateral decision to establish a contingency reserve. By transferring funds to a trust, rather than an ordinary bank account, it has asserted that a deductible "payment" was made under § 461(f). Unlike the taxpayer in *Consolidated Edison*, however, Poirier & McLane was not *required* to make any payment in 1964. Nor did the exigencies of litigation compel the company to establish the trust. Its decision to do so was totally voluntary, unilateral and principally dictated by tax motives.[10]

---

**9.** The Regulation states:

(c) *Transfer to provide for the satisfaction of an asserted liability*—(1) *In general.* A taxpayer may provide for the satisfaction of an asserted liability by transferring money or other property beyond his control (i) to the person who is asserting the liability, (ii) to an escrowee or trustee pursuant to a written agreement (among the escrowee or trustee, the taxpayer, and the person who is asserting the liability) that the money or other property be delivered in accordance with the settlement of the contest, or (iii) to an escrowee or trustee pursuant to an order of the United States, any State or political subdivision thereof, or any agency or instrumentality of the foregoing, or a court that the money or other property be delivered in accordance with the settlement of the contest. A taxpayer may also provide for the satisfaction of an asserted liability by transferring money or other property beyond his control to a court with jurisdiction over the contest. Purchasing a bond to guarantee payment of the asserted liability, an entry on the taxpayer's books of account, and a transfer to an account which is within the control of the taxpayer are not transfers to provide for the satisfaction of an asserted liability. In order for money or other property to be beyond the control of a taxpayer, the taxpayer must re-

linquish all authority over such money or other property.

**10.** We do not comprehend our brother's continued emphasis on the fact that Poirier & McLane transferred these funds beyond its control, about which there is no issue. Poirier & McLane, however, had absolute discretion over the timing and the relatively arbitrary amount it alone decided to transfer in trust. We do not believe Congress ever intended § 461(f) to permit taxpayers to unilaterally decide when and in what amount to "manufacture" tax deductions.

The dissenting opinion misreads the statute's requirement that absent a contest, the liability must be deductible in "the taxable year of the transfer (or for an earlier taxable year)". This does not, as the dissenting opinion suggests, controvert our conclusion. Rather, we believe the statute merely reaffirms that general principles of accrual accounting are applicable; since, if not contested, many of the liabilities covered by § 461(f) would be accrued when they became due, rather than when paid. This certainly does not indicate any Congressional intention to give taxpayers the sole choice of years and amount in which to take the deduction.

A statute designed to "realistically match receipts and disbursements" for specific taxable years should not be interpreted to permit a taxpayer to create a deduction in a year of his choosing by the simple expedient of transferring assets to a trust.[11] Protests that the Regulation places taxpayers in an "unnatural litigating position" by requiring disclosure of their evaluation of the claim are irrelevant. The statute does not purport to grant a "right" to a deduction. Rather § 461(f) authorizes a departure from the general principle of accrual in very limited circumstances, and taxpayers like Poirier & McLane, whose contested liabilities never became reasonably ascertainable, may not take shelter under its narrow roof.

The requirement that claimants be made parties to the trust agreement is also a useful safeguard against abuses of 26 U.S.C. § 461(f). Unlike direct payments to plaintiffs, transfers to trusts can form great potential for misuse. There is little reason to assume solicitude by the settlor towards the beneficiary of such a trust. There may be a strong temptation for the taxpayer not to relinquish full control, especially when the trustee is a personal friend rather than a disinterested bank.

If the claimants are aware of the trust arrangement, as they are required to be under the Regulation, they can ensure that its assets remain beyond the taxpayer's control. While it is true that the trustee has an independent duty to safeguard trust property, only the person asserting the liability is likely to be zealous in objecting to a breach of that duty.[12] In a trust such as Poirier & McLane's, where claimants were never aware of its existence, this important prophylactic measure was lost.

We conclude, therefore, that the assent of the person asserting the liability is required under Reg. 1.461–2(c)(1)(ii). This requirement is an integral means of effectuating the legislative intent of 461(f). Mindful of the strong presumption in favor of the validity of Treasury Regulations, *Commissioner v. South Texas Lumber*, 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831 (1948), we conclude the Regulation is a reasonable interpretation of the statute.

The trust created by Poirier & McLane concededly did not comply with the requirements of Regulation 1.461–2(c)(1)(ii) as we have interpreted it. Accordingly the Corporation's payments were not deductible in 1964. The decision of the Tax Court is reversed and remanded with instructions to recompute Poirier & McLane's tax liability for the years in question, disallowing the deduction of $1,100,000 in 1964.

MANSFIELD, Circuit Judge (dissenting):

I respectfully dissent for the reason that the accrual-basis taxpayer in this case, having fully complied with both the letter and the spirit of § 461(f) of the Internal Revenue Code and of Regulation 1.461–2(c)(1) as reasonably construed, was entitled to deduct the payment made irrevocably by it in trust to Manufacturers Hanover Trust Co. to satisfy liabilities asserted against it in a much larger amount, which were then being contested by the taxpayer. The majority, in denying deductibility on the ground that the claimants did not sign the trust instrument, acts on the basis of newly-devised theories as to Congress' intent which find no support in the language, purpose, or legislative history of § 461(f). Indeed, not one of the ten-member panel of the Tax

---

**11.** Such a deduction resembles the "anticipatory accrual" disapproved by the Tax Court in *Overlakes Corp. v. CIR*, 41 T.C. 503 (1964), aff'd, 348 F.2d 462 (2d Cir. 1965), cert. denied, 382 U.S. 988, 86 S.Ct. 547, 15 L.Ed.2d 475 (1966).

**12.** We believe that the source of this Regulation lies in the legislative history of § 461(f) rather than the intricacies of trust law. We would note, however, that whether the settlor or creditors are beneficiaries of a trust estab-

lished for the payment of creditors is a question of intent. 2 Restatement of Trusts 2d § 330h, *see also Ehag Eisen. Holding AG v. Banca Nat. a Romaniei*, 306 N.Y. 242, 251–252, 117 N.E.2d 346 (1954). But if the transfer is pursuant to an agreement with the creditor, the terms of the agreement are controlling on this question. It would not be unreasonable for the Commissioner to allow a deduction under § 461(f) only for trusts that meet this objective standard.

Court (either of the majority or the minority) and no party to this litigation has ever suggested or endorsed the reasoning or theory advanced by the majority. The reason for this is plain—the theory is contrary to the plain language and purpose of the statute.

Section 461(f) was adopted by Congress in 1964 in part to meet the problem created by the Supreme Court's decision in *United States v. Consolidated Edison Co. of New York*, 366 U.S. 380, 81 S.Ct. 1326, 6 L.Ed.2d 356 (1961), which held that an accrual-basis taxpayer, even though it had paid a contested tax liability under protest, was not entitled to accrue the payment as a deductible expense until the year when all those events occurred which would determine the fact and amount of the liability. Congress modified this requirement in § 461(f) by expressly authorizing the taxpayer to deduct an amount transferred beyond its control to satisfy an asserted liability contested by it, provided that "but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer (or for an earlier taxable year)." The legislative history of § 461(f) reveals that Congress' purpose was to permit the taxpayer to match the deduction with the year in which the transfer was actually made, thus bringing it closer to the period when the income to which it is chargeable was received, rather than to wait until the fact and amount of the liability would finally be determined, which might (as in this case) take several years.

The important condition precedent to deductibility under § 461(f) was that funds placed in trust or escrow to satisfy contingent contested liabilities be put "beyond the taxpayer's control." S.Rep. No. 830, Part 2, 88th Cong., 2d Sess. 243 (1964). To implement § 461(f) Treas.Reg. § 1.461-2(c) was adopted. It specifies that the taxpayer may provide for satisfaction of an asserted liability in contest "by transferring money or other property beyond its control . . . to an escrowee or trustee pursuant to a written agreement (among the escrowee or trustee, the taxpayer, and the person who is asserting the liability) that the money or other property be delivered in accordance with the settlement of the contest, . . ."

In the present case the taxpayer faced liabilities asserted by nine claimants totalling $14,781,150, which it contested. It transferred $1,100,000 not as self-controlled "contingency reserve" (as the majority would have it) but beyond its control to the Manufacturers Hanover Trust Co. for the benefit of the claimants, pursuant to a written agreement which provided that the fund be used to satisfy the claims after the fact and amount of the liability had been determined. It retained only such interest as might remain after the claims had been satisfied. The trust instrument provided that the "sole purpose" for which the funds transferred to the trustee could be used was the payment of the alleged obligations to the nine specifically designated beneficiaries. Aside from the fiduciary responsibilities to the beneficiaries which the instrument imposed on the trustee under New York law,[1] the trust agreement expressly limited the trustee's right to make any disbursements prior to termination of the litigation to those "required to satisfy and discharge the obligation and responsibility" of the settlor to the named beneficiaries. Moreover, there is not the slightest suggestion that the trustee, Manufacturers Hanover Trust Company, was or might be inclined to act illegally or against the interest of the named beneficiaries. Nor has the appellant shown that the taxpayer/settlor could have revoked the trust at his own initiative or have invaded the fund set aside for the benefit of the claimants. There is no evidence that the taxpayer's transfer of funds to the trustee was not made in good faith or that the taxpayer had any reason to believe that the litigation would eventually result in a reduction of the liability to but a fraction of the amount asserted.

---

1. *In re Bond and Mortgage Guarantee Co.*, 303 N.Y. 423, 103 N.E.2d 721 (1952); N.Y.E.P.T.L. § 11–2.1(a) (McKinney's 1967).

Thus the payment satisfied the plain language of § 461(f) and of Treas.Reg. 1.461–2(c) by placing the money beyond the taxpayer's control to satisfy a contested contingent liability. Although the trust agreement was signed by the taxpayer and by the trustee but not by the claimants, the latter, by the clear intent of the taxpayer/settlor, were just as much parties to it as if they also had signed it, since under its terms and applicable New York law, they acquired irrevocable rights once the fund was transferred to the trustee; thereafter the trustee could not, absent the beneficiaries' consent, return the funds to the taxpayer without becoming liable. See N.Y.E.P.T.L. § 7–19; *Schoellkopf v. Marine Trust Co.*, 267 N.Y. 358, 196 N.E. 288 (1935). The terms of this trust fall under the rule that a settlor "may manifest an intention to create a trust in favor of the creditor and to give him an interest in the property of which the debtor cannot subsequently deprive him by revoking the disposition." Restatement of Trusts 2d § 330, Comment h.

In denying deductibility the majority bases its holding on some assumptions which strike me as being both unfounded and illogical. First, it erroneously asserts that Congress intended § 461(f) to apply only to instances "where payment had been 'actually made' " to the claimant, since "[b]y satisfying the asserted claim, the taxpayer fixed the fact and amount of its liability in that taxable year." Nothing in the language or legislative history of § 461(f) supports this bald *ipse dixit*. On the contrary, the report of the Senate Committee on Finance (S.Rep. No. 830), which accompanied the bill (H.R. 8363, Revenue Act of 1964), made it clear that the statute was designed to permit deduction of payments made in satisfaction of liabilities that might be contingent as to amount rather than substantially fixed, subject to the condition that any overpayment would have to be included by the taxpayer in reportable income in the year when this amount of the liability would ultimately be determined. On this subject, the Report states:

"To the extent that deductions are allowed under this rule and then subsequently as a result of the contest the items were found not to be payable, adjustment can be made for this overstatement of the deduction by the inclusion of the overstatement in income in the year in which the amount of the liability is finally determined.

". . . The amendment provides that if a taxpayer contests an asserted liability, such as a tax assessment, but makes a payment in satisfaction of this liability and the contest with respect to the liability exists after the payment, then the item involved is to be allowed as a deduction or credit in the year of the payment. This is based upon the assumption that the deduction or credit in this case would have been allowed in the year of payment, or perhaps in an earlier year when it would have been accrued, had there been no contest.

"The treatment provided here can be illustrated by an example. Assume that in 1965 a $100 liability is asserted against a business which it pays at that time but contests the liability in a court action. Assume further that in 1967 the court action is settled for $80. Under present law, before the enactment of this provision, the deduction of $80 would be allowed in 1967. Under your committee's action, the taxpayer could claim a $100 deduction in 1965 but then in 1967 would have to take $20 into income except as provided in section 111 of the code, relating to recovery of bad debts, prior taxes, and delinquency amounts." S.Rep. No. 830, 88th Cong., 2d Sess. 100–101 (1964), U.S.Code Cong. and Adm.News, p. 1773.

The majority seeks to avoid this plain statement of legislative intent by suggesting that Congress was referring to payments made pursuant to "escrow" agreements rather than "trust" agreements and that a payment made under an escrow agreement is somehow or other a more final and binding recognition of the fact and amount of the taxpayer's liability than is a payment into an irrevocable trust to satisfy the claim, even though in both cases the liability and amount may not yet be deter-

mined. Under the "trust" agreement in the present case, just as under the "escrow" agreement to which the majority refers, the money is placed by the taxpayer beyond his control, and the trustee, just like the escrowee, is obligated to use it to satisfy the contested claim when the taxpayer's liability and the amount due are ultimately fixed. The trustee, like the escrowee, may return any overpayment to the taxpayer who is then obligated to declare it as income in the year of receipt.

The trust agreement, therefore, is the legal equivalent of the escrow agreement and does not represent, as the majority characterizes it, a "reserve" or a bank account under the taxpayer's control. Furthermore, in paying the money to an escrowee, which is conceded by the majority to be permissible under § 461(f), the taxpayer has just as much "discretion over the timing" and over the amount to be paid as he does in making the payment to a trustee as in the present case. Undoubtedly it was for this reason that the Commission, in enacting Regulation 1.461–2(c)(1)(ii), uses the terms "trustee" and "escrowee" interchangeably in describing transfers that will satisfy § 461(f).

In short, the payment made by Poirier and McLane was no more unilateral, arbitrary or fixed in amount than a payment into escrow which, the majority concedes, is authorized by § 461(f). The effect of the majority's restrictive interpretation is to limit the availability of § 461(f) whether by trust or escrow to those "all or nothing" contests where the amount of the claim is substantially undisputed and the issue or contingency turns on whether the taxpayer is liable at all.

The majority further proceeds to reason that the claimant's signature on the trust agreement is required since it "fixes the fact and amount of the liability, warranting an accrual taxpayer to take the deduction when payment is made." Aside from the erroneous assumption that the amount of the liability must be fixed during the year of the deduction (already discussed above), I find no logic in the further assumption that

a claimant's participation would tend to fix the amount of the liability or that it might promote a policy of limiting the deduction to the lowest amount within reasonable range of the anticipated liability. On the contrary, before signing the claimant would prefer, and might insist, that the largest possible amount be transferred in trust or escrow—in this case some $14,781,500 instead of the $1,100,000 transferred in trust—in the interest of insuring payment of his claim, preferably in the full amount. The majority's assertion that Treas.Reg. 1–461–2(c) requires the claimant's signature on the trust agreement could therefore only have the adverse effect of encouraging deductions at the highest range of possibilities since no litigating claimant would agree to a lesser amount for fear of an uncollectible judgment or of prejudicing his litigation position or possible settlement of his claim.

The majority's additional assertion that the signature of the beneficiary on a § 461(f) trust would somehow serve the purpose of matching the deduction with the year of the alleged accrual of the liability is unrealistic and at odds with the language of § 461(f). In enacting the statute, Congress recognized that the accrual method taxpayer could not hope uniformly to take his deduction in the same year as the alleged liability would have been payable but for the contest; its expressed purpose was to overturn the Supreme Court's holding in *Consolidated Edison*, which restricted the availability of the deduction to the year of the final adjudication of the dispute. That the taxpayer might have some choice as to the year when the deduction might be taken is recognized by § 461(f)(4), which states that a qualifying "deduction would be allowed for the taxable year of the transfer (or for an earlier taxable year)." Even accepting as a goal the desire to restrict the taxpayer's choice of the year when the deduction might be taken and assuming that it would be more equitable to have the deduction taken in a year closer to the occurrence of the facts giving rise to the disputed claim so as to accurately match that year's receipts with disbursements chargeable to that year's operations, the

requirement that the beneficiary sign the trust agreement would contribute nothing toward achieving that goal. On the contrary, the signature requirement here imposed by the majority might well delay the deduction because the claimant could use the requirement as a bargaining chip in negotiations. Furthermore, there is no assurance that the taxpayer would propose the creation of either a trust or escrow in any given year.

For the foregoing reasons I construe Treas.Reg. 1.461–2(c) as not requiring the nine claimants' signatures on the trust instrument in the present case, and I conclude that § 461(f) was fully satisfied by the taxpayer's transfer of the trust fund beyond its control to satisfy their contingent claims. This interpretation not only accords with the language and purpose of the statute but makes it unnecessary to hold, as would be required if the word "among" as used in the Regulation were construed as requiring the claimants' signatures on the trust agreement, that the Regulation to such extent is unlawful for the reason that it adds a condition and restriction not contemplated by Congress and not reasonably necessary to accomplish Congress' purpose. See *Morrill v. Jones*, 106 U.S. 466, 467, 1 S.Ct. 423, 27 L.Ed. 267 (1882); *Miller v. United States*, 294 U.S. 435, 439, 55 S.Ct. 440, 79 L.Ed. 977 (1934); *Koshland v. Helvering*, 298 U.S. 441, 447, 56 S.Ct. 767, 80 L.Ed. 1268 (1936); *Manhattan General Equipment Co. v. Commissioner of Internal Revenue*, 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528 (1936).

I would affirm.